[No. 2161]

## H. H. PORCH, Plaintiff-Appellant, *v.* J. C. PATTERSON, ANNIE B. PATTERSON, and GEORGE H. GREENFIELD, Defendants. ANNIE B. PATTERSON, Defendant-Respondent.

[156 Pac. 439]

1. APPEAL AND ERROR—CONDITIONAL AFFIRMANCE.
   Where the principles of a case are controlled by the decision in a former case in which a petition for rehearing is pending, the decision rendered in the case at bar will be subject to further order, dependent upon the final disposition of the petition for rehearing.

APPEAL from the Fourth Judicial District Court, Elko County; *E. J. L. Taber,* Judge.

Action by H. H. Porch against J. C. Patterson and others. From a judgment for the defendants, plaintiff appeals. **Affirmed on conditions.**

*E. A. Klein,* for Appellant:

The signature of respondent to the mortgage was not necessary, under the constitution, as no written declaration of a homestead was ever filed by her. Section 30, article 4, of the constitution, required the legislature to enact laws providing for the recording of homesteads within the county in which they shall be situated; and in compliance therewith section 2142, Revised Laws, was enacted; and section 2160, Revised Laws, subsequently enacted, is void, being in violation of the direct and mandatory provisions of section 30, article 4, of the constitution.

*B. F. Curler* and *F. S. Gedney,* for Respondent:

Appellant's contention as to the law of homesteads has been repudiated by this court. (*Estate of Walley,* 11 Nev. 262; *In Re Cook's Estate,* 34 Nev. 217; *Goldman v. Clark,* 1 Nev. 607.)

A homestead, as provided by law, shall be exempt from any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists. (Const. Nevada, sec. 30, art. 4.)

Section 2160, Revised Laws, is simply a limitation upon the power of the husband to alienate or encumber a certain kind of community property. Such power exists in the legislature, in the absence of a constitutional inhibition. (*Lies* v. *Diabler*, 12 Cal. 328; *Holyoke* v. *Jackson*, 3 Wash. T. 239, 3 Pac. 841; *Adams* v. *Black*, 6 Wash. 528, 33 Pac. 1074; *Gund* v. *Parke*, 15 Wash. 393, 46 Pac. 408; *Warburton* v. *White*, 174 U. S. 484, 44 L. Ed. 555.)

By the Court, McCARRAN, J.:

This case presents the precise question involved in the case of *First National Bank of Ely* v. *Meyers*, 39 Nev. 235, 150 Pac. 308. Upon authority of that case the judgment will be affirmed.

We appreciate that the question involved in these two cases is of the greatest importance, not only to the parties to these two suits, but to the bar and the people generally. The learned junior justice, who files a dissenting opinion in this case, did not participate in the decision by this court in the Meyers case, *supra*. In the latter case there is now pending a petition for a rehearing. We have concluded not to determine the petition for a rehearing in the Meyers case until after the publication of the opinions filed in this case and opportunity afforded for any member of the bar to be heard *amicus curiæ* upon the question involved. We are advised that counsel for appellant in the case at bar has left the state, and whether he or other counsel for appellant appears further by way of petition for a rehearing in this case, the judgment now entered will be subject to further order dependent upon the final disposition of the petition for rehearing in the Meyers case, so that the final disposition of the two cases by this court will be the same.

The two points of view, relative to the proper construction to be placed on our constitutional and statutory provisions concerning homesteads and community property, are presented in the opinion heretofore rendered in the Meyers case and in the dissenting opinion in this case. The divergent views are worthy of most careful consideration, not only by the members of the court, but by the bar in

general.    Subject to the conditions heretofore stated, the judgment is affirmed.

NORCROSS, C. J.: I concur.

COLEMAN, J., dissenting.

I dissent from the judgment in this case and from the views expressed in the Meyers case, which is the basis of the judgment in the case at bar, and because of the great importance of the questions involved, shall undertake to give the reasons which seem to me to fully justify my action.

While the opinion in the Meyers case correctly quotes the homestead act of 1879 (Stats. 1879, c. 131), we call attention at the outset to the fact that the act of 1879 was an amendment to section 1 of the homestead act of 1864–65.   The original act of 1864–65 reads in part as follows:

"SECTION 1.   The homestead, consisting of a quantity of land, together with the dwelling house thereon, and its appurtenances,. not exceeding in value the sum of five thousand dollars, to be selected by the husband and wife, or either of them, or other head of a family, shall not be subject to forced sale on execution, or any final process from any court, for any debt or liability contracted or incurred after November thirteenth, in the year of our Lord one thousand eight hundred and sixty-one.   Said selection shall be made by either the husband or wife, or both of them, or other head of a family, declaring their intention, in writing, to claim the same as a homestead.   Said declaration shall state that they, or either of them, are married, or if not married, that he or she is the head of a family, that they, or either of them, as the case may be, are at the time of making such declaration, residing with their family or with the persons under their care and maintenance on the premises, particularly describing said premises, and that it is their intention to use and claim the same as a homestead, which declaration shall be signed by the party making the same, and acknowledged and recorded as

conveyances affecting real estate are required to be acknowledged and recorded, and from and after the filing for record of said declaration, the husband and wife shall be deemed to hold said homestead as joint tenants.

"SEC. 2. * * * nor shall said homestead property be deemed to be abandoned without a declaration thereof in writing, signed and acknowledged by both the husband and wife, or other head of a family, and recorded in the same office, and in the same manner, as the declaration of claim to the same is required to be recorded. * * * " (Stats. 1864–65, pp. 225, 226.)

It will be seen that the amendment of 1879 in no way affects the question involved in the case at bar. The amendatory act of 1879 did not amend section 2, quoted.

In territorial days, before the adoption of our constitution, there was what may be said to have been a *de facto* homestead; that is, the filing and recording of a statement claiming certain premises as a homestead was not necessary. (Stats. 1861, p. 24; *Child* v. *Singleton,* 15 Nev. 463.)

It is conceded that were it not for the act of 1897, amending section 6 of the act of 1873 (Stats. 1873, c. 119), defining the rights of husband and wife, the mortgage in question in the present case would be valid. It is the contention of appellant, as it was in the Meyers case, that section 30, article 4, of our constitution, which provides: " * * * Laws shall be enacted providing for the recording of such homestead within the county in which the same shall be situated," is mandatory, and that, the legislature having passed an act in pursuance thereof, no subsequent legislature could repeal or amend the same so as to dispense with the filing of such homestead statement, so long as the constitutional provision quoted is in force. While in considering this case we must discuss several questions pertaining to the rules relative to the construction of statutory and constitutional provisions, it will all be solely for the purpose of an intelligent consideration

and determination of the contention of appellant, as just stated.

Is section 30, article 4, of the constitution mandatory? Without discussing the question at all, the court in the Meyers case says: "Pursuant to the directory provision. * * * " With all due respect for the learning and judgment of my associates, I must take issue with the statement just quoted. That constitutional provisions may be mandatory is clear. A most excellent work which is now being presented to the bench and bar of the country says:

"In the interpretation of constitutions questions frequently arise as to whether particular sections are mandatory or directory. The courts usually hesitate to declare that a constitutional provision is directory merely in view of the tendency of the legislature to disregard provisions which are not said to be mandatory. Accordingly it is the general rule to regard constitutional provisions as mandatory, and not to leave it to the will of a legislature to obey or disregard them. This presumption as to mandatory quality is usually followed, unless it is unmistakably manifest that the provisions were intended to be directory merely. The analogous rules distinguishing mandatory and directory statutes are of little value in this connection, and are rarely applied in passing upon the provisions of a constitution. So strong is the inclination in favor of giving obligatory force to the terms of the organic law that it has even been said that neither by the courts nor by any other department of the government may any provision of the constitution be regarded as merely directory, but that each and every one of its provisions should be treated as imperative and mandatory, without reference to the rules distinguishing between directory and mandatory statutes. Occasionally in the body of a state constitution there is inserted a declaration that its provisions are mandatory and prohibitory, unless by express words declared to be otherwise. The use of the word 'shall' is generally

considered as an indication of the mandatory character of the provision." (6 R. C. L. p. 50.)

See, also, 8 Cyc. p. 762.

But we need not look further than our own court for authority to sustain the contention, for it was said, in *Dunker* v. *Chedic,* 4 Nev. on page 382, "Save that the legislature must obey the direct commands of the constitution. * * *" In the opinion of the writer, it is not an open question in this state whether or not the constitutional provision under consideration is mandatory. In an opinion written by Chief Justice Beatty, concurred in by Justices Hawley and Leonard, conceded to have been the very ablest court the state has ever had, it is said:

"But by section 30, article 4, of the constitution, the legislature of the state was *enjoined* to pass laws providing for the recording of homesteads, and in pursuance of this *injunction,* the law of 1865 (requiring recording) * * * was passed." (*Child* v. *Singleton,* 15 Nev. 463.)

This court, consisting of the same able jurists, speaking through the same judge, again says:

"That section is an enlargement and adaptation of section 9 of the homestead act of 1861, of which the whole act is simply a reenactment with some trifling alterations, and the addition of provisions for recording homesteads and declarations of abandonment, made, no doubt, for the purpose of carrying out the apparent purpose of the framers of the constitution to make registration of the homestead a condition precedent to its exemption, and to the disability of the owner to alienate or incumber it." (*Estate of Walley,* 11 Nev. 265.)

What plainer language could have been used? The court says it was the apparent purpose of the framers of the constitution to make registration of the homestead a condition precedent to its exemption. We are at an utter loss to conceive of words more emphatically stating the purpose of the framers of the constitution.

Not content with the declaration last quoted, this court, composed of the same able expounders of the law, speaking through Mr. Justice Leonard, in *Smith* v. *Stewart,* 13 Nev. at page 69, reiterates its interpretation of the section mentioned, in the following words:

"It may be well to notice preliminarily, however, that at the session of the legislature of 1864–65 the constitution of this state was in force, and that section 30, article 4, *required* laws to be enacted providing for the recording of homesteads within the county in which the same should be situated. Such provision was made in section 1, statute of 1864–65."

Can there be any doubt as to the idea which the court meant to convey by the word "required"? Does it not clinch the contention that the constitutional convention made it mandatory upon the legislature to pass such a law?

Again, in *Smith* v. *Shrieves,* 13 Nev. at page 327, Judge Beatty, in expressing his dissent (from the judgment of the court upon another matter) says:

"There is no room for doubt that the occasion for enacting a new homestead law in 1865 was the requirement of the constitution, then newly adopted (art. 4, sec. 30), that laws should be passed providing for the recording of homesteads in the counties wherein they were situated. In compliance with this *injunction* of the constitution the California law of 1860 was copied."

"Upon still another ground we think there must be a decree against the defendants. This homestead right, if any such was acquired, must have been acquired under the act of March 6, 1865 (1 Comp. Laws, p. 60, sec. 186, *et seq.*), which so far as relates to the question involved, is a verbatim copy of the California act of April 28, 1860 (Stats. 1860, 311). Under the constitution of Nevada a homestead right is acquired 'as provided by law.' (Const. art. 4, sec. 30.) Now, the mode provided by law is as prescribed by the act of 1865 above cited. To secure the right there must be a declaration in writing, either by husband or wife, or

both, making the claim and stating the matters required by that act, signed, acknowledged, and recorded as conveyances affecting real estate are required to be acknowledged and recorded, 'and from and after the filing for record of said declaration the husband and wife shall be deemed to hold said homestead as joint tenants'; that is to say, the character of the homestead attaches, and the estate takes its new characteristics as such from the date of this record. (*Smith, Administrator,* v. *Shrieves,* 13 Nev. 303.) The mortgage in this case was made and recorded long before the filing of the declaration of homestead. There can be no doubt, we take it, that if the Corbetts at the date of the mortgage had sold this property (block 56), taking their pay for it, and had executed a conveyance in fee, such conveyance could not have been defeated by any subsequent filing of a declaration of homestead by either husband or wife, or both, or, in other words, by any homestead right acquired after the making and recording of the conveyance. (*Hawthorne* v. *Smith,* 3 Nev. 182, 93 Am. Dec. 397; *Estate of Walley,* 11 Nev. 265.) If so, the mortgage cannot be defeated, for it was executed for a valuable consideration, when no homestead right had attached, 'as provided by law.' The object of the law requiring a declaration to be filed, among other things, 'particularly describing the premises,' was doubtless to give notice to parties dealing with the property, and till such notice parties could safely deal with it. This is not like a case of attachment or judgment lien. Those are but general lines imposed *in invitum* by the law. The party parts with no consideration to obtain them until he actually purchases at the sheriff's sale. The indebtedness has already been incurred without taking security, and the attaching or judgment creditor is only seeking to force himself, under the law, into a better position. Until he has purchased at the sale he has parted with nothing on the credit of the property. If a sale should actually take place before any claim of homestead is made, I apprehend a

title would pass, notwithstanding a subsequent claim of homestead should be made with all the forms of law. This seems to be the view of the law taken by the Supreme Court of Nevada in *Hawthorne* v. *Smith, supra*. But in making this mortgage there was the consent of the party, and the mortgage was given in consideration of the money advanced. The money was advanced on the credit of the property and the mortgagee stands in the same position that a *bona fide* purchaser taking a conveyance in fee would occupy. The property, under the constitution and laws, had not then been impressed with the character of a homestead. Such was the construction actually given to the California act before it was adopted by Nevada, and the construction, being most reasonable, may be presumed to have been adopted with the language of the statute; and such is the sound reason of the thing. (*Cohen* v. *Davis*, 20 Cal. 187; *Gluckauf* v. *Bliven*, 23 Cal. 312.) None of the defendants having established a homestead right superior to the mortgage, there must be a decree in favor of the complainant." (*Com. & Sav. Bank of San Jose* v. *Corbett*, 5 Sawy. 543, Fed. Cas. No. 3058.)

Thus it will be seen that not only did the legislature which followed on the heels of the constitutional convention construe the provision in section 30, article 4, of the constitution as being mandatory, but every judge who lived at the time of the holding that convention, who drank inspiration from it, and who had occasion to consider the question, also so construed it.

But the Meyers case practically reverses the former decisions of the court, without discussing them at all. We are therefore called upon to consider if the court is justified in so doing. In the first place, it seems to the writer that opinions from a court composed of such able jurists as Justices Beatty, Hawley, and Leonard are conceded to have been are entitled to consideration and an analytical discussion before they are overruled; otherwise it is an open question whether or not the court really intended to overrule the decisions

mentioned; but, since the decisions alluded to were called to the attention of the court in the Meyers case by the brief of counsel for respondent, we can but infer that it was the intention of the court to reverse the former decisions. However, let that be as it may, we will consider the propriety of adhering to the rule formerly well established by the authorities referred to. It is a well-known and universally acknowledged rule for the guidance of courts in the interpretation of statutory and constitutional provisions that the intent of the framers of the section to be construed must control. (*Mighels* v. *Eggers,* 36 Nev. 364, 136 Pac. 106; *State* v. *Brodigan,* 37 Nev. 250, 141 Pac. 988.) No doubt this is why it is also held that:

"Contemporaneous and practical construction of constitutional provisions by the executive and legislative departments of the government will be considered by the courts in passing upon constitutional questions." (8 Cyc. 736.)

" 'Great regard,' says Lord Coke, 'ought, in construing a statute, to be paid to the construction which the sages of the law, who lived about the time or soon after it was made, put upon it, because they were best able to judge of the intention of the makers at the time when the law was made.' " (Dwarris on Statutes, 2d ed. 1848, p. 562.)

"The presumption is that those who were the contemporaries of the constitution makers have claims to deference of later tribunals because they had the best opportunities of informing themselves of the understanding of the framers, and of the sense put upon the constitution by the people when it was adopted." (6 R. C. L., p. 63.)

In *Labadie* v. *Smith,* 41 Okl. at page 779, 140 Pac. at page 430, the court quotes:

"The construction placed on statutes or constitutional provisions by officers in the discharge of their duties, either at or near the time of the enactment, which has

been long acquiesced in, is a just medium for the judicial interpretation."

See, also, *Logan* v. *Davis,* 233 U. S. 613, 34 Sup. Ct. 685–690, 58 L. Ed. 1121; *State* v. *Brodigan,* 35 Nev. 39, 126 Pac. 682.

The contemporaneous interpretation of the legislature of section 30, article 4, of the constitution was manifested by its enactment at its session in 1864–65 of a law requiring the recording of the declaration of the selection of the homestead. The legislature evidently construed that section of the constitution as an injunction upon it to pass such a law. Not only was that legislature imbued with that idea, but so was this court, as is manifest from the decisions from which we have quoted.

And that the full force of the rule contended for may be appreciated, it should be borne in mind that the constitutional convention adjourned July 27, 1864, and that the first legislature thereafter, and the one which enacted a law requiring the recording of a declaration of the selection of a homestead, convened December 12 of the same year. The decision in *Estate of Walley,* *supra,* was rendered in 1876, about twelve years after the constitutional convention had adjourned, and the other decisions not very long thereafter. Thus it would seem that if the intent of the constitutional convention, as interpreted by the legislature of 1864–65, and by this court a few years later, should control, as seems to be in accord with judicial expressions, the courts of the state at this day are bound to adhere to the holding that the portion of section 30, article 4, of the constitution quoted above is mandatory.

But had there been no judicial expression on the point by this court, I am constrained to believe that every reasonable consideration justifies this court at this time in holding that the portion of the constitution in question is mandatory. This statement opens up for investigation the intent of the constitutional convention in

incorporating in the constitution the language quoted. In considering this phase of the case, it might be well to have in mind the fact that if the amendment of 1897, *supra,* is valid, it works a practical return to the situation which existed before the adoption of the constitution (when no recording was required), and to inquire what the reason was which induced the constitutional convention to adopt the mandatory provision of section 30, article 4, of the constitution, requiring that the legislature pass a law providing for the recording of the homestead selection. If the law as it then stood was satisfactory; if it protected all persons from fraudulent practices — what good could have been accomplished by a change? The conclusive presumption must be that some strong reason animated the constitutional convention, because not a dissenting voice was raised in protest against the provision relating to recording. As is said in Beal on Cardinal Rules of Legal Interpretation, at page 274:

"Among the things which have passed into canons of construction recorded in Heydon's case (1584), 3 Rep. 18, pt. III, 7b, we are to see what was the law before the act was passed, and what was the mischief or defect for which the law had not provided, what remedy parliament appointed, and the reason of the remedy. (*Eastman Photographic Materials Co.* v. *Comptroller-General of Patents, Designs and Trademarks,* 1898, A. C. 571, at page 573; 67 L. J. Ch. 628, at page 630, Earl of Halsbury, L. C.)"

See, also, 26 Am. & Eng. Ency. Law (2d ed.) p. 632; *Maynard* v. *Johnson,* 2 Nev. 27; 6 R. C. L. p. 50.

Courts are governed by the same rules in construing both statutes and constitutions. (*State* v. *Arrington,* 18 Nev. 414, 4 Pac. 735.)

Now, it may be good deal a matter of guesswork for us at this distant day to say exactly what evil the constitutional convention sought to remedy in providing

for the passage of an act requiring the recording of a homestead selection, but that does not lessen the impression that there was some well-grounded reason for the action.  Hon. Charles E. De Long, who was a conspicuous figure in the constitutional convention, in one of his speeches in that body said:

"If he commences at that figure, and files his declaration, he will not obtain credit upon that property which he has set apart as his homestead.  He gives notice to the world, by the act of recording his homestead, that that property cannot be touched to pay his debts, and then nobody is defrauded.  Nobody can lose a dollar by it, because every business man will understand that that homestead is no basis upon which he can give the man credit, and if he owns nothing aside from that, he has no basis upon which to obtain credit except his honor."  (Nevada Const. Deb. and Proc. p. 285.)

He again says:

" *  *  *  Then I file my declaration claiming it as a homestead."  (Id., p. 286.)

The views thus expressed were accepted without question.  Thus we see that the purpose of the constitutional convention, as clearly expressed, was to prevent fraud, which carries the implication that events had proven that the law as it then existed did not do so.

Without indulging at length in speculation, we may with profit show one danger that might flow from sustaining the judgment of the lower court, by an illustration which has been suggested to our mind.  It might transpire in many cases that while the record title to real property, as would appear from an abstract of title, would be perfect, nevertheless a pitfall would lurk unnoticeable.  Suppose title to a city lot ran to John Smith alone seventeen years ago.  Three months later he conveyed to his successor by a deed showing neither the signature nor existence of Smith's wife.  Thereupon, like others who have momentarily touched the

affairs of our state and departed, he left for parts unknown, and nothing has been heard of him since. Although the record title to the property may be as straight as a string, capital, knowing the shoals ahead, will falter and ask, "Did Smith have a wife at the time of his conveyance?" The best, possibly, that can be furnished in answer to this question is vague neighborhood repute of years ago. If he was married at that time, did his wife live with him on the premises when Smith executed the deed? To answer this it may be ascertained by again consulting the old neighbors that some old woman lived with Smith on the place, but whether wife, sister, housekeeper, or some other they were never able to determine—the occupants were of a reticent and incommunicative disposition. These questions indicating doubt and uncertainty and title chaos, may be indefinitely multiplied. It is learned that during the same period Smith owned a little farm outside the city, and those of his neighbors who still live and can be found may recollect that Smith and the woman referred to spent a portion of their time in the city and a portion on the farm. Which is the homestead *de facto?* Are both such? If we do away with the selection by recording, which the constitution contemplated and the statute of 1864–65 carried out, we are in doubt as to which in legal contemplation was the homestead (*de facto*) as well as when such a legal characterization properly terminated. The early statute makes clear what shall be necessary to constitute an abandonment of the homestead, viz, a declaration of abandonment in writing signed and acknowledged by both spouses and recorded in the same office, and in the same manner, as the declaration of claim to the same is required to be recorded. Is this now the law, if, as the opinion in the Meyers case states, "the statute of 1897 was in effect a reenactment of the policy of the territorial act repealed by the statute of 1865"? If it is, it seems foolish to

require a record of the abandonment and not of the claim of homestead itself. If it is, and an abandonment be recorded, how soon thereafter may the homestead *de facto* be reestablished by resuming residence on the premises or, indeed, by simply continuing to reside thereon? If it is not, what would constitute an abandonment of the claim by Smith and his spouse, and how shall a record thereof be made so that in after years it may be proved and the validity of the Smith deed established.

Speculation aside, we need not search far for at least one motive which probably animated the constitutional convention. That body was composed of 39 members, 33 of whom came from California to Nevada between 1856 and 1864. The legislature of California, in 1851, passed a homestead act in which no provision was made for recording the homestead selection (Stats. Cal. 2d Sess. 1851, p. 296.) In the case of *Reynolds* v. *Pixley*, 6 Cal. 165 (decided at the April term, 1856), it is said:

"Before leaving this case we feel constrained to express our regret that the legislature has failed to provide that notice of homestead should, in all cases, be recorded. Such a law would do away with all the difficulties which now embarrass these rights, and be found a wise and salutary barrier against deceit and dishonesty. As the law now stands, so far from accomplishing the end designed, it is a fruitful source of fraud and perjury, and will eventually lead to more mischief than all the other difficulties which embarrass real property in this state. These rights are so illy defined, that it is almost impossible for human foresight to detect or guard against them; and much of the property of this state, which has passed through many hands, will eventually be found incumbered to its full value with these unrecorded liens."

The legislature of California, in 1860 (Stats. 1860, p. 311), evidently because of the language quoted from

the California case, amended the act of 1851 so as to make necessary the recording of the homestead. Thus it can be easily seen that in all probability the constitutional convention of Nevada, in providing for the passage of a law making necessary the recording of the homestead selection, was, to some extent at least, animated by the words of the Supreme Court of California and the action of the legislature of that state.

Furthermore, since there is no conflict between sections 30 and 31, article 4, of the constitution, we think this court has passed upon substantially the identical question now before us in the case of *State* v. *Arrington*, 18 Nev. 412, 4 Pac. 735. In that case the question involved was whether or not the legislature could fill an office, in view of the language of the constitution, which provides for the election of public officials by the people. The court said:

"But in seeking for limitations and restrictions, we must not confine ourselves to *express* prohibitions. Negative words are not indispensable in the creation of limitations to legislative power, and, if the constitution prescribes one method of filling an office, the legislature cannot adopt another. * * * For instance, it is declared in section 32, article 4, that the legislature shall provide for the election by the people of certain officers named. There are no negative words employed to the effect that the legislature shall not elect or appoint them, or provide for their election or appointment in some other way; still no one would claim that a law providing for their election or appointment by a different mode would be constitutional. In fact, counsel for respondents admit that it would not be. " * * * On the contrary, section 32 of article 4 plainly shows an intention to leave it to the legislature whether officers other than those specifically named are required, and if they are, power is given to create

them and to make provision for filling them, provided
only that the incumbents shall be elected by the people.
* * * The upshot of the whole matter is this: The
framers of the constitution decided for themselves that
the officers named were necessary and should be elected
by the people; but they left it to the legislature to
decide as to the necessity of additional ones, whether
state, county, or township, requiring only that they, like
those named, should be elected by the people."

To bring out clearly the force of the opinion cited,
we will paraphrase the language quoted, the interpolated
words being italicized:

"But in seeking for limitations and restrictions, we
must not confine ourselves to express prohibitions.
Negative words are not indispensable in the creation of
limitations to legislative power, and, if the constitution
prescribes one method of *creating a homestead,* the
legislature cannot adopt another. * * * For instance,
it is declared in section *30,* article 4, that the legisla-
ture shall provide for the *recording of homesteads.*
There are no negative words employed to the effect
that the legislature shall not *provide for homesteads
without requiring them to be recorded;* still no one
would claim that a law providing *homesteads and pre-
scribing that they need not be recorded would be con-
stitutional.* * * * On the contrary, section *30,* article
4, plainly shows an intention to leave it to the legisla-
ture *what the value and extent of homesteads should
be,* and power is given to create them and to make pro-
vision for *the formalities which shall attend them,* pro-
vided only that they shall be recorded. * * * The
upshot of the whole matter is this: The framers of
the constitution decided for themselves that *homesteads
were necessary and should be recorded;* but they left it
to the legislature to decide as to the necessity of *other
formalities and as to the value and extent of the home-
stead."*

If the judgment appealed from should be sustained,

what would be the effect as applied to other portions of the constitution? Section 25, article 4, of the constitution (Rev. Laws, 283) reads:

"The legislature shall establish a system of county and township government which shall be uniform throughout the state."

Section 26, article 4 (Rev. Laws, 284), reads:

"The legislature shall provide by law, for the election of a board of county commissioners in each county, and such county commissioners shall jointly and individually perform such duties as may be prescribed by law."

We have quoted two successive sections of the constitution, in each of which is embodied instructions to the legislature; and, if the theory of respondent is correct, what is to prevent the legislature, under the powers given it by section 25, from providing for the appointment of boards of county commissioners instead of their election? Or, again, what shall prevent the legislature, under section 26, from violating the provision of section 25 as to uniformity by prescribing different duties for the boards of the various counties? Further illustrating our view, section 32, article 4, of the constitution (Rev. Laws, 290) deals with the legislative power over certain county officers, and provides:

" * * * The legislature shall provide for their election by the people, and fix by law their duties and compensation" (an instruction to the legislature, as in the section relative to homesteads).

If the theory of respondent is sound, under section 25, article 4, above mentioned, the legislature might violate section 32, just quoted, by providing that one or more of the county officials specified in section 32 be appointed by the governor, instead of being elected by the people. But that this cannot be done, see the Arrington case, *supra.*

Other similar illustrations might be given, but to do so would unduly prolong this opinion.

The court, in the case of *Morris* v. *Powell,* 125 Ind. 292, 25 N. E. 224, 9 L. R. A. 326, had under consideration

substantially the same question involved here, wherein it was said:

"It is a well-settled rule of law that 'when the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference, to add to the condition or to extend the penalty to other cases.' This language of Judge Cooley is quoted with approval by the court in the case of *Quinn* v. *State, supra,* 35 Ind. 485, 9 Am. Rep. 754. See, also, Mech. Pub. Off. sec. 148; *State* v. *Williams,* 5 Wis. 308, 68 Am. Dec. 65, *supra; State* v. *Tuttle,* 53 Wis. 45, 9 N. W. 791. In other words, when the constitution commands how a right may be exercised, it prohibits the exercise of that right in some other way. If exercised at all it must be exercised as commanded by the constitution."

"A state constitution is also binding on the courts of the state, and on every officer and every citizen. Any attempt to do that which is prescribed in any other manner than that prescribed, or to do that which is prohibited, is repugnant to that supreme and paramount law, and invalid." (6 R. C. L. p. 40.)

Other instructive cases on this question are: *Keller* v. *State* (Tex. Cr. App.) 87 S. W. 669, 1 L. R. A. n. s. 489; *Water Co.* v. *Covington,* 156 Ky. 569, 161 S. W. 988; *Atkinson* v. *Board,* 18 Idaho, 282, 108 Pac. 1046, 28 L. R. A. n. s. 412; *State* v. *Railway* Co., 253 Mo. 642, 162 S. W. 144; *State* v. *Moores,* 55 Neb. 480, 76 N. W. 175, 41 L. R. A. 624; *State ex rel. Crumb* v. *Mayor,* 34 Mont. 67, 85 Pac. 744; 8 Cyc. 741; *State* v. *Butler* (Fla.) 69 South. 771.

It is contended that, pursuant to section 31 of article 4 of the constitution, the legislature had the right to amend section 5 of the act of 1873, as was done by the legislature of 1897, as quoted in the Meyers case. In construing constitutions and statutes there is no more familiar rule than the one requiring that, where possible, effect be given to every word.

"It is an elementary rule of construction that effect

must be given, if possible, to every word, clause, and sentence of a statute. In other words, a statute must receive such construction as will make all its parts harmonious with each other, and render them consistent with its general scope and object." (*Ex Parte Prosole*, 32 Nev. 383, 108 Pac. 632; *Torreyson* v. *Board*, 7 Nev. 22; *Heywood* v. *Nye County*, 36 Nev. 571, 137 Pac. 515.)

In considering the subject of construction of constitutions, it is said:

"In construing a constitutional provision it is the duty of the court to have recourse to the whole instrument, if necessary, to ascertain the true intent and meaning of any particular provision; and, if there is an apparent repugnancy between different provisions, the court should harmonize them, if possible. Frequently the meaning of one provision of a constitution, standing by itself, may be obscure or uncertain, but is readily apparent when resort is had to other portions of the same instrument. It is therefore an established canon of constitutional construction that no one provision of the constitution is to be separated from all the others, and to be considered alone, but that all the provisions bearing upon a particular subject are to be brought into view and to be so interpreted as to effectuate the great purpose of the instrument. * * * Another elementary rule is that, if possible, effect should be given to every part and every word, and that unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as superfluous. Hence, as a general rule, the court should avoid a construction which renders any provision meaningless or inoperative." (6 R. C. L., pp. 47, 48.)

On the same point Cyc. says:

"The whole instrument is to be examined with a view to ascertaining the meaning of each and every part. The presumption and legal intendment is that each and every clause in a written constitution has been inserted for some useful purpose, and therefore the instrument must be construed as a whole in order that its intent

and general purposes may be ascertained; and, as a necessary result of this rule, it follows that wherever it is possible to do so, each provision must be construed so that it shall harmonize with all others, without distorting the meaning of any such provision, to the end that the intent of the framers may be ascertained and carried out and effect given to the instrument as a whole." (8 Cyc. p. 730.)

Now it is clear that if effect is to be given to section 31, article 4, of the constitution, as held in the Meyers case, that portion of section 30, article 4, of the constitution providing for the passage of a law requiring the recording of a declaration of homestead is nullified. This cannot be done if the rule of construction which we have invoked is still operative, as we understand it to be.

Can it be said that, even though that portion of section 30, article 4, of the constitution in reference to the passing by the legislature of a law providing for the recording of a declaration of homestead is mandatory, and that a legislature complied with that mandate, a subsequent legislature can nullify the command of the constitution by passing another law, in conflict with the law passed in pursuance of such mandate? We think not.

We would be willing to concede that if there were an irreconcilable conflict between sections 30 and 31, article 4 of the constitution, probably the latter section would control; but there is no conflict between them. Consequently we are of the opinion that, while the legislature can pass laws defining the rights of the wife to the community property, such laws must be confined in their scope within such limitations as not to conflict with a law passed in pursuance of a mandatory provision of the constitution, and when such laws are passed they are valid. But when a law is passed which in its scope is in conflict with one enacted in pursuance of such mandatory provision of the constitution, it is void.

As an illustration, suppose there were no laws in the

state against gambling; that the legislature passes an act incorporating the city of Reno, and by section 30 of the act provides that there shall be no faro played in said city, and that the city council shall pass an ordinance making the playing of faro a misdemeanor, punishable by a fine; that by section 31 of said incorporation act it is provided that the city council shall pass an ordinance regulating gambling in said city; that in pursuance of section 30 the city council passes an ordinance making the playing of faro a misdemeanor, and fixing the punishment at a fine of $500 for each offense; that subsequently the city council passes an ordinance regulating gambling in said city, by the terms of which it is provided that the city may license individuals to carry on gambling of all kinds on Virginia Street between the hours of 6 p. m. and 6 a. m. Would any one have the temerity to urge that such an ordinance would be valid as to the game of faro? We think not, and for the reason that the legislature makes it mandatory upon the city by the act of incorporation to pass an ordinance prohibiting faro, and such mandate having been carried into effect, it cannot be nullified by another ordinance in conflict with it, for the reason that the act of incorporation is the very foundation of the city organization, and all of its ordinances must be subordinated to the act bringing the city government into existence. So, in the case at bar, the constitution is the very foundation of our state government, and while by section 31 power is given the legislature to pass a certain law, it cannot be supposed that the framers of the constitution presumed that the scope of the law passed in pursuance thereof would be in conflict with a mandatory provision of section 30 of the constitution, but in harmony with it. It is well said in *State* v. *Butler* (Fla.) 69 South. at page 781:

"Where a constitutional provision will bear two constructions, one of which is consistent with, * * * an intention expressed clearly in a previous section, the

former must be adopted, that both provisions may stand and have effect" (citing *Chance* v. *County of Marion,* 64 Ill. 66).

Being convinced that the former decisions of this court, in which it was held that the provision of section 30, article 4, of the constitution is mandatory, are sound, and that there is no irreconcilable conflict between sections 30 and 31 of said article 4, I see no way of escaping the force of the language used by Beatty, C. J., in *State* v. *Hallock,* 14 Nev. on page 205, 33 Am. Rep. 559, where he said:

"It is true that the constitution does not expressly inhibit the power which the legislature has assumed to exercise, but an express inhibition is not necessary. The affirmation of a distinct policy upon any specific point in a state constitution implies the negation of any power in the legislature to establish a different policy. 'Every positive direction contains an implication against anything contrary to it which would frustrate or disappoint the purpose of that provision. The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance.' (*People* v. *Draper,* 15 N. Y. 544.) The presumption is always that the positive provisions of a constitution are mandatory and not merely directory (Cooley's Const. Lim. 78, 79), and there is nothing to overthrow this presumption with respect to the provisions under discussion."

See, also, *State* v. *Gas Co.,* 15 Ariz. 294, 138 Pac. 781.

The court in the Meyers case cites several decisions from the State of Washington to the effect that the husband could not convey the real property belonging to the community unless the wife joined. We have no fault to find with those decisions; but in none of those cases was there involved the constitutional question presented in the Meyers case and in the case at bar, and

consequently they are of no weight in determining the question demanding our consideration.

Since that portion of section 30, article 4, of the constitution, requiring the legislature to pass laws providing for the recording of the selection of a homestead, and the passing of an act in pursuance thereof, was mandatory and not in conflict with section 31 of that article of the constitution, I am of the opinion that the amendment of 1897, which is quoted in the Meyers case, is void, and that the judgment of the lower court should be reversed.