OPINION
 

 Per Curiam:
 

 This case is about providing Nevadans a clear and certain pathway for effecting constitutional change. In this, we adopt an unequivocal objective test for judicial review of this and future ballot petitions. In this appeal, we decide whether the district court properly denied a complaint for declaratory and injunctive relief, which sought to prevent the Tax and Spending Control for Nevada Initiative from being placed on the November 2006 general election ballot. Because the initiative petition was not filed in compliance with mandatory requirements set forth in the Nevada Constitution, we conclude that the district court erred in denying declaratory and injunctive relief. Accordingly, we reverse the district court’s order.
 

 FACTS
 

 On December 22, 2005, respondents Bob Beers, Ann O’Connell, Kiley Chandler, and the Tax and Spending Control Committee (collectively “the committee”) submitted to respondent Secretary of State two versions of an initiative petition both entitled Tax and Spending Control for Nevada (TASC). The TASC initiative generally proposes a constitutional amendment that would (1) impose spending limits for state and certain local governments; (2) require voter approval for new taxes; (3) change the existing Fund to Stabilize the Operation of State Government and the Disaster Relief Account therein, replacing them with a “Budget Stabilization Fund” and “Emergency Reserve Fund,” restricting the definition of “emergency,” barring the Governor and Legislature from appropriating funds in the event of a fiscal emergency; (4) prohibit the state from “directly or indirectly enacting] laws or authorizing] the adoption of regulations [ ] requiring the counties and cities of the State to provide new services, expand existing services or conduct new or additional governmental function[s] without appropriating or designating state funding sources to fully support” the same; (5) freeze the “proportion of state revenue paid to all local units of government, taken as a group”; and (6) require that any proposed amendment to the Constitution mandating appropriations for specific projects or services that does not also establish a specific source of additional state revenue dedicated to
 
 *934
 
 fully funding those appropriations include a “notice” on the ballot stating that the amendment could be detrimental to other state services.
 

 The difference between the two December versions of the initiative
 

 The two December versions of the TASC initiative differed with respect to section 4(4), which provides the basis for calculating the state spending limit for the initial biennial budget. The first version of the initiative was submitted on standard-sized 8.5 X 11-inch paper, and section 4(4) of that version provided that, for the initial biennial 2009-2011 budget cycle, the base years for calculating the state spending limit “shall be the 2005-2007 biennium adjusted for cumulative changes in population and inflation occurring between January 1,
 
 2007
 
 and January 1, 2009.” (Emphasis added.) The second version of the initiative was submitted on legal-sized 8.5 x 14-inch paper, and section 4(4) of that version provided that the base biennium for calculating the spending limit “shall be the 2005-2007 biennium adjusted for cumulative changes in population and inflation occurring between January 1,
 
 2005
 
 and January 1, 2009.” (Emphasis added.) Thus, the legal-sized version contained a four-year (2005-2009) population and inflation adjustment for calculating spending limits for the initial biennium, whereas the standard-sized version contained a two-year population and inflation adjustment (2007-2009).
 
 [1]
 
 The Secretary of State’s Office apparently did not realize that the committee had submitted two different versions of the petition, and it filed both on December 22, 2005.
 

 Early challenge to the initiative’s description of effect
 

 On February 3, 2006, TASC opponents challenged in the district court the “description of effect” contained in the December 2005 petitions. This challenge was brought under NRS 295.061(2), which requires that each initiative contain a description — on each signature page of the petition — of the effect that it will have if approved by voters. Although both December versions included the same description of effect, the opponents alleged that that de
 
 *935
 
 scription did not adequately describe the impact that the TASC initiative would have if approved by voters. The district court agreed with the challengers, concluding that the description did not ‘ ‘fully and accurately describe” the TASC initiative’s effects.
 

 In accordance with the district court’s order, the committee submitted a revised description of effect, which the district court adopted as adequate by order dated March 7, 2006. On March 8, 2006, the committee filed with the Secretary of State a new copy of its initiative petition with the revised description of effect. Like the December 2005 standard-sized petition, section 4(4) of the March 8, 2006 TASC petition provided that, for the initial biennial 2009-2011 budget cycle, the base biennium for calculating the state spending limit “shall be the 2005-2007 biennium adjusted for cumulative changes in population and inflation occurring between January 1, 2007 and January 1, 2009.”
 

 The voter-signed, initiative petition differs from the filed petition
 

 On June 20, 2006, the committee submitted to the county registrars’ offices its registered-voter-signed initiative petition. Unlike the March 8 petition, however — with the base biennium adjusted for population changes and inflation during a two-year period, 2007 to 2009 — the signed petition documents included the version of section 4(4) that provided that the base biennium would be adjusted for changes in population and inflation during a four-year period, 2005 to 2009. The relevant distinctions between the different versions of the petition with regard to the description of effect and section 4(4) are set forth in the following chart.
 

 [[Image here]]
 

 Accordingly, although the circulated version contained the same version of section 4(4) as the December legal-sized version, the two petitions were not the same. To the contrary, the circulated version contained the court-approved description of effect (contained in the March 8, 2006, version), whereas the December legal-sized version contained the inaccurate description of effect rejected by the district court.
 

 
 *936
 

 The opponents’ complaint for declaratory and injunctive relief
 

 Because of the difference between the March 8 version filed with the Secretary of State and the version circulated among voters, and on the basis that the initiative, in violation of NRS 295.009, embraced more than one subject, the opponents filed a complaint for declaratory and injunctive relief in the district court to prevent the initiative’s placement on the ballot.
 

 The opponents’ complaint was supported with, among other things, a memorandum, several affidavits, and exhibits, including financial data. According to the opponents’ memorandum and supporting documents, the discrepancy between the two versions of the petition in section 4(4) is “substantive” and “massive,” amounting to more than a $1.5 billion difference in the initial 2009-2011 state spending limit.
 

 Financial analysts assessing the fiscal impact of the different budgetary bases set forth in the two versions of the petition at between $1,390,944,845 and $1,574,747,078
 
 [2]
 
 attested that their assessment was based on estimated inflation and population growth in the state between 2006 and 2009, using an average from past years adjusted for projected trends in growth, and that this methodology is sound and well-accepted in the field of public finance. The analysts further attested that state government spending has historically (per biennium period in 1989 through 2007) grown at a rate of 19.3 percent per year but the circulated version of the TASC initiative would allow for a 21-percent increase in state spending during the 2009-2011 budget cycle. In other words, the circulated version promotes a growth in spending beyond Nevada’s historic rate of spending growth. On the other hand, the analysts determined that the filed March 8 version would have capped the growth in state spending at 7.4 percent over the previous biennium.
 

 Additionally, the director of the nonpartisan Legislative Counsel Bureau (LCB), with the help of the Bureau’s Fiscal Analysis Division, calculated that the fiscal impact on spending limits between the two versions amounted to a $1.68 billion difference. This calculation was based on the legislatively approved budget for the 2005-2007 biennium, less funds not included in the TASC initia-
 
 *937
 
 five’s scope and less any amounts authorized but not spent. The LCB’s analysis compared the spending limit between the circulated and filed versions, concluding that the circulated version would allow for $13,691,480,461 in spending, whereas under the filed version, spending would be limited to $12,013,868,231, amounting, approximately, to a $1,677,623,230 difference. In other words, the circulated version, which would be presented to voters on the ballot, provided for 14-percent more spending than the filed version.
 

 The committee’s motion to dismiss
 

 Although the committee conceded that the petition circulated for signatures differed from the petition that the committee had filed with the Secretary of State on March 8, it nevertheless filed a lengthy motion to dismiss the opponents’ complaint. In support of the dismissal motion, the committee’s Executive Director attested that the opponents’ assertion that “this minor typographical error’’ would make a $1.3 billion or more difference in the initial state spending limit was an obvious attempt to “pull this ‘rabbit out of the hat’ after it was too late to make any changes.’ ’ The Director offered nothing to refute that the difference in the base-years calculation would result in an over $1 billion difference in the 2009-2011 state spending limit. Additionally, the committee’s counsel attested that the Secretary of State’s Office did not request a new fiscal note after the discrepancy was discovered because “the language of the body of the petition was not changed.”
 

 Finally, the committee provided a letter from respondent Bob Beers, who, in addressing the opponents’ contention that the difference in spending for the initial budget would be over $1 billion, wrote, ‘ T believe the difference creates only a potential error that is not likely to ever be realized, thus has no or minimal fiscal impact.” Nevertheless, Beers agreed with the LCB that the base biennium budget in the circulated petition would be larger than it would be under the March 8 filed petition. According to Beers, any difference would be minimal “because after TASC is implemented, the spending limit will have been based on the
 
 lesser
 
 of actual spending or the theoretical initial spending limit.’ ’ (Emphasis added.) But, as opponents point out, the TASC initiative at section 4(1) provides that the state spending limit will be actual spending, adjusted for population changes and inflation growth, or the previous spending limit, “whichever amount is
 
 greater.”
 
 (Emphasis added.)
 

 The district court’s order
 

 After the parties submitted briefs, the case was argued before the district court. The court then entered an order denying the com
 
 *938
 
 mittee’s motion to dismiss and denying the opponents’ request for declaratory and injunctive relief, namely that the court prohibit the Secretary of State from placing the initiative on the ballot.
 

 The court also stated that there was “absolutely no doubt that the initiative that [was] filed with the Secretary of State wasn’t the one that was circulated.” Observing that there were two standards — “strict adherence” and “substantial compliance”— that it could apply in determining the validity of the TASC initiative, the court concluded that substantial compliance was the better alternative.
 

 With regard to NRS 295.009’s single-subject rule, the court concluded that the TASC petition was in substantial compliance with the rule, finding that the initiative’s single purpose was to limit government growth. This appeal followed.
 

 DISCUSSION
 

 NRS 295.009, which requires initiatives to include a description of effect, and NRS 295.061, which provides the right to challenge an initiative’s description of effect, are constitutional
 

 Preliminarily, the committee argues that any noncompliance with the description-of-effect requirement under NRS 295.009(l)(b) should not be fatal to the TASC initiative because NRS 295.061 — which allows a party to challenge the description of effect language — imposes an “extra-constitutional” burden on the initiative process.
 
 [3]
 
 According to the committee, because the Constitution only requires that the “full text of the measure proposed” be included on the petition, the Legislature did not have the power to enact NRS 295.009, requiring a description of effect, or NRS 295.061, providing a right to challenge that description. The committee asserts that NRS 295.061 places a severe burden on core political speech in violation of the First Amendment and that the district court’s order invalidating the original description of effect amounted to a prior restraint. We disagree.
 

 
 *939
 
 The constitutionality of a statute is a question of law subject to de novo review.
 
 [4]
 
 Statutes are presumed to be valid, and the challenger bears the burden of showing that a statute is unconstitutional.
 
 [5]
 
 In order to meet that burden, the challenger must make a clear showing of invalidity.
 
 [6]
 

 Although the Nevada Constitution provides that the power to propose amendments to the Constitution by initiative petition is reserved to “the people,”
 
 [7]
 
 it also provides that the Legislature may enact laws that provide procedures to facilitate the initiative and referendum process.
 
 [8]
 
 Additionally, the legislative power includes the broad power to frame and enact laws, unless there is a specific constitutional limitation to the contrary.
 
 [9]
 
 Here, the plain language of Nevada Constitution Article 19, Section 5 imparts in the Legislature authority to enact laws to facilitate the initiative process, such as requiring a description of effect and allowing challenges on this basis.
 
 [10]
 

 Other states have constitutionally imposed similar legislation to provide for a summary or description of the initiative on the face of the petition.
 
 [11]
 
 And in
 
 Campbell
 
 v.
 
 Buckley,
 

 [12]
 

 the Tenth Circuit Court of Appeals upheld, over a First Amendment challenge, Colorado’s requirement that an initiative include a title that expresses the initiative’s true intent, concluding that the statutory summary, single-subject, and title requirements served to ‘ ‘prevent voter confusion and promote informed decisions.”
 
 [13]
 
 The court also
 
 *940
 
 concluded that the state’s important regulatory interests were sufficient to justify the reasonable and facially neutral title-setting requirement.
 
 [14]
 

 Accordingly, we conclude that both NRS 295.009’s description of effect requirement and NRS 295.061’s proviso allowing for a challenge to that description are legitimate procedures that, in accordance with Nevada Constitution Article 19, Section 5, facilitate the people’s right to meaningfully engage in the initiative process.
 

 The March 2006 petition is the petition on file with the Secretary of State
 

 Additionally, the committee’s argument that it complied with all constitutional filing requirements when it filed the December 2005 legal-sized petition, containing the same section 4(4) language as the circulated petition, is unavailing. Both of the December versions contained defective descriptions of effect and, for that reason, only the March version is operational since it, with its compliant description of effect, was by definition the “copy” that the committee intended to circulate. Article 19, Section 2(4) states, with emphasis added, that “[i]f the initiative petition proposes an amendment to the Constitution,
 
 the person who intends to circulate it shall file a copy
 
 with the Secretary of State before beginning circulation.’ ’
 

 Although the committee asserts that the description of effect is designed to be a quick reference and the initiative’s “actual language” is what becomes binding if approved by voters, the committee dilutes the importance of the description of effect. In particular, the committee’s analysis skips a step, ignoring the fact that this descriptive language is what appears directly above the signature lines, as registered voters decide the threshold issue of whether they even want the initiative placed on the ballot. Nevada Constitution Article 19, Section 2(4) requires the committee to file a “copy” of the petition that it “intends to circulate” with the Secretary of State, and the description of effect has been made part of that filing requirement under NRS 295.015. Accordingly, a “copy” of the petition that the committee “intend[ed] to circulate”—namely the copy with the compliant description of effect-had to be filed in order to satisfy both constitutional and statutory filing requirements.
 

 Throughout these proceedings, the committee has characterized the difference in the March 8 version and the circulated version as a “typographical error,” but while the discrepancy may have been
 
 *941
 
 inadvertent, the record demonstrates, as set forth below, that the difference between the March 8 filed version and the circulated version was material and substantial in at least two respects.
 

 First, the difference between the two versions’ initial 2007-2009 spending limit has been calculated at approximately $1.3 billion, representing 14 percent of the state’s budget, and the committee offered no nonspeculative evidence to refute the fiscal analysis. Notably, the circulated version allows for a 21-percent increase in state spending during the initial budget cycle. Contrasted to the March 8 filed version, which would constrain spending to 7.4 percent — a substantial reduction over the historical rate of growth in government spending — the difference is significant. Moreover, because the spending limit for the initial 2009-2011 biennium would become the basis for all future spending limits, the effect of the “typographical error” would reach far beyond the $1.5 billion mark.
 

 Second, because the circulated version allows for $1.5 billion
 
 more
 
 in spending per biennium than the filed version, and because, under the circulated version, spending could continue at or even beyond its historic rate, the primary purpose of the TASC measure would not be effectuated under the circulated version. In other words, the circulated petition, as drafted, would have no effect on the very problem that it claimed that it would remedy, i.e., government overspending. Therefore, the circulated version would not be an accurate reflection of the committee’s vocalized intent to implement a constitutional limit on government spending. The circulated petition involves more than a mere “typographical error”; it is misleading.
 

 And as the opponents point out, if the committee were permitted to file multiple versions of the initiative with the Secretary of State and rely on any or all of them, interested parties would be left to guess which version was being circulated, and only when the circulated version was submitted to the county registrars’ offices for verification would anyone other than the proponents have the opportunity to review which version was to be placed on the ballot. Thus, because the two December versions of the petition contained noncompliant descriptions of effect, which the district court invalidated, the March 8 petition, containing the revised description of effect in accordance with the district court’s order, is the representative “copy” on file with the Secretary of State that was intended to be circulated for signatures, as set forth under both Nevada Constitution Article 19, Section 2(4) and NRS 295.015, which mirrors Article 19, Section 2(4)’s language.
 

 With this issue resolved, we now turn to the district court’s order denying the opponents’ request for injunctive and declaratory relief.
 

 
 *942
 

 Standard of review
 

 Because the district court’s decision denying declaratory and in-junctive relief was made in the absence of any factual dispute, we review the district court’s order de novo.
 
 [15]
 

 Constitutional analysis
 

 Under Nevada Constitution Article 19, Section 2(4), if an initiative petition proposes a constitutional amendment, the party “who intends to circulate it shall file a copy with the Secretary of State before beginning circulation.”
 
 [16]
 

 Unless ambiguous, the language of a constitutional provision is applied in accordance with its plain meaning.
 
 [17]
 
 Although Nevada Constitution Article 19, Section 2(4) clearly and unambiguously sets forth the requirement for filing initiative petitions with the Secretary of State, using the mandatory term “shall,” it is helpful to understand the purpose behind the filing requirement in the context of the parties’ arguments, since the opponents contend that the provision provides an important safeguard that must be adhered to strictly, while the committee characterizes any discrepancy within its filed and circulated petitions as a “minor typographical error” that would not violate a substantial compliance standard.
 

 In analyzing a provision similar to Article 19, Section 2(4), contained in the California Constitution,
 
 [18]
 
 California Supreme Court Justice Kennard explained that the requirement that a copy of a proposed initiative be filed with the state “serves the objective of
 
 *943
 
 providing consistent, reliable information about the initiative to the Legislature, to certain government offices, to those who may want to comment on the proposal, and to the public.”
 
 [19]
 
 Similarly, Nevada Constitution Article 19, Section 2(4) serves the important purpose of providing sufficient information so that voters can intelligently evaluate whether to sign an initiative petition, so that interested persons may make an informed decision to support or oppose the petition, so that the measure’s proponents and opponents may examine the initiative, develop arguments, and disseminate information relevant to their positions, and so that confusion — as pointedly illustrated by this case — can be avoided.
 
 [20]
 

 By requiring an initiative’s proponents to file a true copy of the proposed initiative before circulating it, Article 19, Section 2(4) allows both proponents and opponents to examine the initiative, develop arguments, and disseminate their views to the public. Thus, Article 19, Section 2(4) protects the integrity of the initiative process by requiring that an initiative’s proponents notify, at an early stage, all those concerned — including future voters — about a proposed initiative’s purpose and effect. This interpretation is also consistent with the stated purpose behind Article 19, Section 2(4)’s statutory counterpart, NRS 295.015, which was enacted during the 1981 legislative session.
 
 [21]
 
 When the Senate Committee on Government Affairs discussed the filing requirement, the Secretary of State at that time stated that the “sole purpose” of the requirement was to establish a procedure for filing initiative petitions before circulation, which would allow his office to “make the text of a petition available to the public for study during the signature process.”
 
 [22]
 

 Strict adherence
 
 vs.
 
 substantial compliance
 

 We next address the parties’ arguments about whether a “strict adherence” or “substantial compliance” standard should apply to
 
 *944
 
 evaluating whether the committee satisfied Article 19, Section 2(4)’s mandate. The opponents argue that strict adherence should apply here, where the constitutional requirement at issue is designed to protect the initiative process. The committee, on the other hand, advocates for a substantial compliance standard to apply in cases that do not involve constitutional “authentication” requirements. We conclude, as set forth below, that Article 19, Section 2 must be adhered to strictly.
 

 And since the committee has made a distinction between different types of constitutional procedural requirements, urging this court to adopt a looser standard of compliance for some constitutional requirements, while maintaining a strict standard for constitutional authentication requirements, we take this opportunity to clarify
 
 Governor v. Nevada State
 
 Legislature,
 
 [23]
 
 wherein this court, in construing the Nevada Constitution, distinguished between “procedural” and “substantive” requirements, concluding that procedure must yield to substance if the requirements conflict.
 
 [24]
 
 We expressly overrule that portion of the opinion. The Nevada Constitution should be read as a whole, so as to give effect to and harmonize each provision.
 
 [25]
 

 We now turn our analysis to the facts at issue in this case and explain why strict adherence is required with respect to Article 19, Section 2(4)’s filing requirement. The district court in this case, relying on the California Supreme Court’s decision in
 
 Costa v. Superior Court,
 

 [26]
 

 applied a substantial compliance standard. In
 
 Costa,
 
 the court, in a divided 4-3 decision, opted for a substantial compliance standard when it reviewed whether California’s Proposition 77 should be invalidated on the basis that the petition filed with the Attorney General’s Office differed from the petition circulated for voter signatures.
 
 [27]
 
 The facts in
 
 Costa
 
 indicated that Proposition 77 proposed to amend the California Constitution by transferring the power to draw election districts from the legislature to a three-member panel of retired judges, who would act as special masters in developing redistricting plans.
 
 [28]
 

 Proposition 77 opponents challenged the initiative in the California Superior Court on the basis that the version filed with the Attorney General’s Office was not the version circulated for sig
 
 *945
 
 natures.
 
 [29]
 
 The discrepancies between the filed and circulated versions of Proposition 77 included (1) a different introductory section setting forth the findings and purpose, (2) a one-day difference in the time period in which the legislature could make its nominations and exercise peremptory challenges for selecting the final list of judges from which the special masters were to be chosen, and (3) an explicit statement that, with regard to the redistricting process, the initiative power was to be used only in the manner prescribed in Proposition 77.
 
 [30]
 
 The Superior Court invalidated Proposition 77 after determining that “ ‘the purposes of the constitutional[
 
 31
 
 ] and statutory[
 
 32
 
 ] requirements at issue would be frustrated if the court were to apply the substantial compliance doctrine to excuse the clear defects in this situation.’ ”
 
 [33]
 

 When the case reached the California Supreme Court, the majority concluded that Proposition 77 should not be invalidated for its procedural deficiencies. The majority reasoned that discrepancies between petition versions should be analyzed under a “substantial compliance standard” and that “ ‘technical deficiencies in . . . initiative petitions will not invalidate the petitions if they are in “substantial compliance” with statutory and constitutional requirements.’ ”
 
 [34]
 
 The court indicated that a substantial compliance standard was consistent with the people’s initiative power and the judicial policy to liberally construe this power.
 
 [35]
 

 The dissenting justices reasoned that ‘ ‘the confusion and uncertainty about which version, if either, would be placed on the ballot necessarily impaired the ability of interested parties to understand the measure and to debate its merits during a crucial preelection period” and that there was “no need to so jeopardize the integrity of the electoral process,” given that the constitutional and statutory mandate of providing to the attorney general a true copy of the initiative to be circulated is “readily and easily met” and is “a simple matter of proofreading.”
 
 [36]
 
 The dissent agreed with the trial court’s conclusion that “ ‘[tjhere is no good reason
 
 *946
 
 to put the courts in the position of having to decide what is good enough for qualifying an initiative measure for the ballot when actual compliance is easily attainable.’ ”
 
 [37]
 

 The dissenting justices also noted that “[w]hen two versions of a proposed initiative differ in ways that change its meaning, ... the doctrine of substantial compliance should not apply, in light of the significant risk of confusing or misleading the public.’ ’
 
 [38]
 
 According to the dissent, given the narrow time frame for a preelection challenge, a court could not “reliably determine that the differences in meaning in the two versions were not significant to any organization, group, or prominent individual in taking an early stand for or against the proposed initiative measure.”
 
 [39]
 
 Further noting that the application of a vague and subjective “substantial compliance” standard presents a risk that “inappropriate considerations will actually influence a court’s substantial compliance determination, or that the public will perceive the court to be so influenced,’ ’ the dissenting justices asserted that this standard was unsuitable.
 
 [40]
 
 The dissent also pointed out that widely disseminated inaccurate information about the meaning of a proposed initiative “can subtly alter the entire electoral process and thereby compromise its integrity.”
 
 [41]
 

 Like the dilemma presented in Costa, in this case, the committee’s proposed initiative petition filed with the Secretary of State on March 8, 2006, differed from the petition that was circulated for signatures and later certified for placement on the ballot. In
 
 Costa,
 
 however, no party contended that the variations between the two versions would affect the estimate of the initiative’s fiscal impact.
 
 [42]
 
 Here, the opponents alleged below and maintain on appeal— as supported by financial analysts’ and the LCB fiscal analysts’ affidavits and financial data — that the difference in the two versions would have an approximately $1.5 billion fiscal impact.
 

 Although significant factual differences exist between the instant case and
 
 Costa,
 
 the
 
 Costa
 
 majority and dissent cogently present the policy rationales underlying substantial compliance and strict adherence in the context of a constitutional requirement for initiative petitions. We are persuaded that the
 
 Costa
 
 dissent presents a stronger rationale and, accordingly, that strict adherence is required with respect to Article 19, Section 2(4)’s filing requirement. The
 
 Costa
 
 majority recognized the importance of the people’s power to initiate constitutional amendments. We agree that the
 
 *947
 
 people’s power to amend the Nevada Constitution through the initiative process is paramount. But that power exists within the current constitution’s boundaries, which place significant value and weight on ensuring that the people are properly and adequately notified about proposed constitutional amendments, that the people are able to understand the effect that the proposed amendment would have if enacted, and that the people are afforded an opportunity to study the initiative and debate its merits during the pre-election stage.
 

 As the
 
 Costa
 
 dissent pointed out, when inaccurate information about a proposed initiative is widely disseminated, as it was here, the integrity of the electoral process is jeopardized. And there is no good reason to put courts in the position to decide whether the discrepancy was so insignificant that it satisfies a “substantial compliance” standard, when a requirement is clearly and unambiguously mandated by the Nevada Constitution, and compliance with that requirement entails nothing more than using a photocopy machine.
 

 This court’s previous decisions also indicate that strict adherence should be required in this instance. For instance, we have demanded strict adherence with respect to our Constitution’s authentication requirements governing an initiative petition,
 
 [43]
 
 and in
 
 Stumpf v.
 
 Lau,
 
 [44]
 
 we concluded that failure to include in a petition a constitutionally mandated enacting clause, which would have advised voters whether the proposed law was constitutional or statutory, invalidated the initiative and required its removal from the ballot. In so doing, this court noted that “ ‘[w]e cannot assume that people are indifferent whether they are asked to approve an ordinary law or to amend their constitution.’ ”
 
 [45]
 
 Similarly, in
 
 Rogers v.
 
 Heller,
 
 [46]
 
 we concluded that an initiative was void for failing to comply with the constitutional provision that prohibits the proposal of any statute making an appropriation without also providing a means for raising revenue.
 

 Although some of this court’s decisions have applied a substantial compliance test, these decisions concerned
 
 statutory
 
 requirements for initiative petitions.
 
 [47]
 
 This court addressed the “strict
 
 *948
 
 adherence” and “substantial compliance” dichotomy in
 
 Cirac v. Lander
 
 County,
 
 [48]
 
 concluding that substantial compliance should apply to a challenge that an initiative did not meet a statutory requirement. In so concluding, this court distinguished
 
 Lundberg
 
 v. Koontz,
 
 [49]
 
 a previous case that discussed
 
 “constitutional
 
 and not statutory requirements when it called for strict construction.”
 
 [50]
 
 Thus, our case law points us in the same direction as the
 
 Costa
 
 dissent: Article 19, Section 2(4) demands strict adherence.
 
 [51]
 

 Further, the Nevada Constitution is the organic and fundamental law of this state, and to allow a sweeping amendment to it or to
 
 *949
 
 this state’s legislative acts, without strict adherence to the rules set forth therein, would work against government stability.
 
 [52]
 
 The strict adherence rule can hardly be considered burdensome, especially when, as here, actual compliance was easily attainable and there exists no acceptable excuse for noncompliance. The importance of following the letter of this state’s seminal law becomes even more apparent in a case such as this, when the two versions of the petition differed in such a way that the initiative’s substantive meaning was altered. While the committee’s error in circulating a different version of the petition appears inadvertent in this case, the resultant effect of the error is that the initiative’s stated purpose of cutting government spending would be defeated in favor of the circulated petition’s language, which enables government spending to grow above and beyond its historical rates.
 

 Moreover, anything less than strict compliance would require courts to assume an impossible line-drawing function, weighing or measuring differences between a circulated and filed petition in order to determine whether the circulated petition was properly certified for the ballot. The problem with the substantial compliance standard is illustrated by the split decision in the
 
 Costa
 
 case. Although the majority characterized the discrepancies between the two Proposition 77 petitions as ‘ ‘technical,’ ’ it also concluded that the two versions differed with regard to “some substantive details.”
 
 [53]
 

 As the dissent in
 
 Costa
 
 pointed out, there is no good reason to put the courts in the position of shooting at a moving target, deciding what is good enough for qualifying an initiative for the ballot, ‘ ‘ ‘when actual compliance is easily attainable.’ ’ ’
 
 [54]
 
 This holds especially true given the shortened time frame for an initiative’s preelection challenge, which does not allow courts to reliably determine whether the degree of noncompliance was significant to voters or groups in deciding whether to support an initiative. Moreover, although a strict adherence standard may work to disqualify an initiative from a particular ballot, its proponents may refile and recirculate a conforming initiative in a future election. In sum, we conclude that the constitutional requirements for engaging in the initiative process provide important safeguards that protect the people’s right to initiate laws and, when coupled with the ease of complying with these requirements, the result is that a strict adherence standard must apply to Article 19, Section 2(4)’s filing re
 
 *950
 
 quirement. Accordingly, here, as the committee did not strictly adhere to the requirements of Article 19, Section 2(4), the TASC initiative necessarily fails.
 
 [55]
 

 CONCLUSION
 

 The TASC initiative proposed an expansive constitutional amendment, and because its proponents failed to adhere to Nevada Constitution Article 19, Section 2, by filing a true copy of the initiative petition with the Secretary of State before beginning circulation, we conclude that the district court erred by denying the opponents’ request for declaratory and injunctive relief. Thus, we reverse the district court’s order. The Secretary of State is prohibited from placing the initiative on the ballot.
 
 [56]
 

 [1]
 

 If enacted, the TASC initiative would apply for the first time to the 2009-2011 budget cycle, which would then serve as the base for all future spending limitations. The TASC initiative provides that, for any biennial budget cycle commencing after January 1, 2009, the spending limit will be set at the greater of (i) the total state spending for the previous biennial budget cycle, adjusted by the percentage change in the consumer price index over the two preceding years plus the percentage change in population over the same period, or (ii) the state spending limit for the previous biennial budget cycle. But for the first budget that TASC would impact, 2009-2011, the base biennium for the spending limit calculation is the 2005-2007 budget, adjusted for population and inflation changes between 2007 and 2009 (standard-sized) or between 2005 and 2009 (legal-sized).
 

 [2]
 

 Although the analysis is too cumbersome to reproduce in this opinion, the $1.39 billion figure results from applying the different section 4(4) versions of the TASC initiative and determining the difference in spending between the filed and circulated petitions. On the other hand, the $1.57 billion figure results from applying the different section 4(4) versions of the initiative but also accounting for the section 4(1) calculation — which further adjusts the spending limit to account for an additional two years of inflation and population growth — and then determining the difference in spending between the filed and circulated petitions. The Legislative Counsel Bureau, as well as TASC proponent and respondent Bob Beers, both adopted this second interpretation of how state spending would be calculated under the TASC initiative.
 

 [3]
 

 As the district court determined, the committee is arguably foreclosed from arguing that NRS 295.061 is unconstitutional because it provides for a pre-election challenge to the description of effect, since NRS 295.061 was squarely at issue in the earlier litigation between the committee and its opponents, and the committee never raised a constitutional objection in that case.
 
 See, e.g., Mill-Spex, Inc.
 
 v.
 
 Pyramid Precast Corp.,
 
 101 Nev. 820, 822, 710 P.2d 1387, 1388 (1985) (“A waiver may be implied from conduct which evidences an intention to waive a right, or by conduct which is inconsistent with any other intention than to waive the right.”). Nevertheless, because we “may examine constitutional issues on appeal that substantially impact the rights of the litigants,” and because we wish to resolve any lingering doubts regarding NRS 295.009’s and NRS 295.061’s constitutionality, we take this opportunity to address the committee’s constitutional arguments.
 
 See Boulder City v. Cinnamon Hills Assocs.,
 
 110 Nev. 238, 245, 871 P.2d 320, 324 (1994).
 

 [4]
 

 Sheriff
 
 v.
 
 Burdg,
 
 118 Nev. 853, 857, 59 P.3d 484, 486 (2002).
 

 [5]
 

 Id.
 

 [6]
 

 Id.
 

 [7]
 

 Nev. Const, art. 19, § 2(1).
 

 [8]
 

 Id.
 
 § 5.
 

 [9]
 

 Galloway v. Truesdell,
 
 83 Nev. 13, 20, 422 P.2d 237, 242 (1967).
 

 [10]
 

 See Citizens For Honest Gov’t v. Sec. of State,
 
 116 Nev. 939, 951 n.10, 11 P.3d 121, 130 n.10 (2000). The committee’s argument that NRS 295.061’s challenge procedure unconstitutionally limits the time for filing and circulating a petition is likewise unavailing, as Article 19, Section 2(4) provides that a petition may be filed with the Secretary of State as early as September 1 of the year before the election, thus allowing several months for signature-gathering. And regardless, the signature requirement was not an issue in this case.
 

 [11]
 

 See,
 
 e.g., Cal. Elec. Code § 9004 (West 2003) (requiring the Attorney General to draft a “summary of the chief purposes and points of the proposed measure”); Colo. Rev. Stat. § 1-40-106 (2005) (establishing a Title Board to designate a title for the proposed constitutional amendment, which “shall correctly and fairly express the true intent and meaning thereof”).
 

 [12]
 

 203 F.3d 738, 745-46 (10th Cir. 2000).
 

 [13]
 

 Id.
 
 at 746.
 

 [14]
 

 Id.
 

 [15]
 

 Secretary of State v. Give Nevada A Raise,
 
 120 Nev. 481, 486 n.8, 96 P.3d 732, 735 n.8 (2004) (citing
 
 University System
 
 v.
 
 DR Partners,
 
 117 Nev. 195, 18 P.3d 1042 (2001) (noting that, where factual issues are not disputed, judgments involving injunctions are reviewed de novo);
 
 County of Clark v. Upchurch,
 
 114 Nev. 749, 961 P.2d 754 (1998) (acknowledging that, where a district court’s decision in a declaratory relief action is based on statutory construction, this court’s review is de novo)).
 

 [16]
 

 Similarly, as noted above, NRS 295.015 provides that, before an initiative petition may be presented to registered voters for their signatures, a copy of the petition, including the description of effect, must be filed with the Secretary of State. Since our analysis turns on the constitutional provision, we do not undertake further review of the statute.
 

 [17]
 

 Rogers
 
 v.
 
 Heller,
 
 117 Nev. 169, 176 & n.17, 18 P.3d 1034, 1038 & n.17 (2001).
 

 [18]
 

 Article II, Section 10(d) of the California Constitution provides that, before an initiative petition proposing a constitutional amendment is circulated, “a copy shall be submitted to the Attorney General.”
 
 See Costa v. Superior Court,
 
 128 P.3d 675, 687 (Cal. 2006).
 

 [19]
 

 Costa,
 
 128 P.3d at 704 (Kennard, J., dissenting). The majority in
 
 Costa
 
 also acknowledged that the purpose underlying the statutory counterpart to Article H, Section 10(d)’s filing requirement was to “ensure that all the relevant officials are ‘on the same page’” about the initiative’s content.
 
 Costa,
 
 128 P.3d at 698 (majority opinion).
 

 [20]
 

 A well-established tenet of our legal system is that the judiciary is endowed with the duty of constitutional interpretation.
 
 See Marbury v. Madison,
 
 5 U.S. 137, 177-78 (1803) (stating that “it is emphatically the province and duty of the judicial department to say what the law is”).
 

 [21]
 

 Hearing on S.B. 105 Before the Senate Government Affairs Comm., 61st Leg. (Nev., Feb. 2, 1981).
 

 [22]
 

 Hearing on S.B. 105 Before the Senate Government Affairs Comm., 61st Leg. (Nev., Feb. 4, 1981).
 

 [23]
 

 119 Nev. 277, 71 P.3d 1269 (2003).
 

 [24]
 

 Id.
 
 at 286, 71 P.3d at 1275.
 

 [25]
 

 See, e.g., Porch
 
 v.
 
 Patterson,
 
 39 Nev. 251, 272-73, 156 P. 439, 446 (1916) (Coleman, J., dissenting).
 

 [26]
 

 128 P.3d 675 (Cal. 2006).
 

 [27]
 

 Id.
 
 at 696-97.
 

 [28]
 

 Id.
 
 at 677.
 

 [29]
 

 Id.
 
 at 676.
 

 [30]
 

 Id.
 
 at 678-79.
 

 [31]
 

 Article n, Section 10(d) of the California Constitution requires an initiative petition’s proponent to file a copy of the petition with the Attorney General before circulating it.
 
 See Costa,
 
 128 P.3d at 687 & n.13.
 

 [32]
 

 Section 9002 of California’s Elections Code provides that, before an initiative petition is circulated, “a draft of the proposed measure shall be submitted to the Attorney General.”
 
 See Costa,
 
 128 P.3d at 687 n.14.
 

 [33]
 

 Costa,
 
 128 P.3d at 681.
 

 [34]
 

 Id.
 
 at 693 (quoting
 
 Assembly of State of Cal.
 
 v.
 
 Deukmejian,
 
 639 P.2d 939, 948 (Cal. 1982)).
 

 [35]
 

 Id.
 
 at 689.
 

 [36]
 

 Id.
 
 at 705-06 (Kennard, J., dissenting).
 

 [37]
 

 Id.
 
 at 706.
 

 [38]
 

 Id.
 

 [39]
 

 Id.
 
 at 706-07.
 

 [40]
 

 Id.
 
 at 707 n.3.
 

 [41]
 

 Id.
 
 at 707.
 

 [42]
 

 See id.
 
 at 682-83 (majority opinion).
 

 [43]
 

 Lundberg v. Koontz,
 
 82 Nev. 360, 366, 418 P.2d 808, 811 (1966).
 

 [44]
 

 108 Nev. 826, 839 P.2d 120 (1992);
 
 see also Caine
 
 v.
 
 Robbins,
 
 61 Nev. 416, 131 P.2d 516 (1942) (voiding an initiative petition for lack of an enacting clause).
 

 [45]
 

 Stumpf,
 
 108 Nev. at 833, 839 P.2d at 124 (quoting
 
 Oregon State Homeowner’s Ass’n v. Roberts,
 
 703 P.2d 954, 958 (Or. 1985)).
 

 [46]
 

 117 Nev. 169, 18 P.3d 1034 (2001).
 

 [47]
 

 See, e.g., Springer
 
 v.
 
 Mount,
 
 86 Nev. 806,
 
 477
 
 P.2d 159 (1970) (applying a substantial compliance test to conclude that, although a number of voters did not provide complete residential information, as required by NRS 293.200(2), the information provided was sufficient to verify their statuses as
 
 *948
 
 registered voters such that the petition was valid);
 
 Cleland v. District Court,
 
 92 Nev. 454, 552 P.2d 488 (1976) (applying a substantial compliance test in assessing compliance with statutory rules governing recall petitions).
 

 [48]
 

 95 Nev. 723, 730, 602 P.2d 1012, 1016 (1979).
 

 [49]
 

 82 Nev. 360, 418 P.2d 808 (1966).
 

 [50]
 

 Cirac,
 
 95 Nev. at 730, 602 P.2d at 1016 (emphasis added).
 

 [51]
 

 Other courts have reached the same conclusion with respect to their constitutional provisions governing initiative petitions.
 
 See, e.g., Watland v. Lingle,
 
 85 P.3d 1079, 1090 (Haw. 2004) (holding that the publication and disclosure language mandated by the Hawaii Constitution is clear and unambiguous and, therefore, it must be construed as written);
 
 Keenan v. Price,
 
 195 P.2d 662, 684 (Idaho 1948) (Miller, J., dissenting) (acknowledging that a change in the constitution requires strict adherence to the rules therein);
 
 McGee v. Secretary of State,
 
 896 A.2d 933, 947-48 (Me. 2006) (Clifford, J., concurring) (explaining that the requirements in a provision that ‘“are of the
 
 very essence
 
 of the thing to be done and the ignoring of which would practically
 
 nullify the vital purpose
 
 of the [provision] itself are regarded by the courts as mandatory’ ” (quoting
 
 In re Opinion of the Justices,
 
 126 A. 354, 363 (Me. 1924)));
 
 Andrews v. Governor cf Maryland,
 
 449 A.2d 1144, 1146 (Md. 1982) (concluding that “‘strict observance of every substantial requirement is essential to the validity of the proposed [constitutional] amendment’ ’ ’ (quoting
 
 Hillman v. Stockett,
 
 39 A.2d 803, 806 (Md. 1944)));
 
 Opinion of the Justices,
 
 664 N.E.2d 792, 796 (Mass. 1996) (noting that when the people seek to enact laws by direct popular vote they must strictly comply with the requirements of the state constitution);
 
 Moore
 
 v.
 
 Brown,
 
 165 S.W.2d 657, 659-60 (Mo. 1942) (noting that “it is fundamental that the people, themselves, are bound by their own Constitution,” and “[w]here they have provided therein a method for amending it, they must conform to that procedure”);
 
 State ex rel. Bogart
 
 v.
 
 Bd. of Elections,
 
 621 N.E.2d 389 (Ohio 1993) (invalidating a referendum petition because it was filed with the wrong official government office);
 
 McWhirter
 
 v.
 
 Bridges,
 
 155 S.E.2d 897, 899 (S.C. 1967) (noting that “[t]he provisions of [South Carolina’s] Constitution relating to its amendment are mandatory and must be strictly adhered to; and a strict compliance with every substantial requirement relating to the amendatory procedure is essential to the validity of any proposed amendment”);
 
 Coleman
 
 v.
 
 Pross,
 
 246 S.E.2d 613, 619 (Va. 1978) (indicating that the prerequisites for the amendment of Virginia’s Constitution are “set forth in precise language and minute detail evidencing the importance attached to these functions,” and the “amendatory processes specified in the Virginia Constitution must be followed if a valid amendment is to be effected”).
 

 [52]
 

 See, e.g.,
 
 Stumpf., 108 Nev. at 832, 839 P.2d at 124 (acknowledging that the “Nevada Constitution is the fundamental law of our state”).
 

 [53]
 

 Costa,
 
 128 P.3d at 693, 697.
 

 [54]
 

 Id.
 
 at 705-06 (Kennard, J., dissenting).
 

 [55]
 

 Although the opponents argue that the TASC initiative violates NRS 295.009(l)(a)’s single-subject requirement and the committee counters that NRS 295.009(l)(a) imposes an unconstitutional restriction on the initiative process, we need not address the single-subject issue here. First, we thoroughly examined the constitutionality of NRS 295.009(1)(a) in
 
 Nevadans for Property Rights
 
 v.
 
 Secretary of State,
 
 122 Nev. 894, 141 P.3d 1235 (2006), concluding that the single-subject requirement was properly enacted under the Legislature’s Article 19, Section 5 authority, and that imposing such a requirement did not run afoul of the First Amendment. Next, because the committee’s failure to comply with Article 19 is dispositive here, we need not reach the opponents’ second argument, that the TASC initiative violated NRS 295.009’s single-subject rule.
 

 [56]
 

 In light of the nature and urgency of this matter, we suspend NRAP 41(a) and direct the clerk of this court to issue the remittitur forthwith.
 
 See Rogers,
 
 117 Nev. at 178 n.24, 18 P.3d at 1040 n.24.