[No. 1260.]

## THE STATE OF NEVADA EX REL. C. C. STEVENSON ET AL., RELATORS, v. GEORGE TUFLY, STATE TREASURER, RESPONDENT.

CONSTITUTION—AMENDMENT—ENTRY ON JOURNALS OF LEGISLATURE.—An amendment was proposed to the constitution of Nevada, authorizing the investment of moneys pledged to educational purposes in the bonds of any of the states of the United States, but no entry of the same was made upon the journal of either house of the legislature: *Held,* that this omission was fatal to the adoption of the amendment.

APPLICATION for *mandamus.*

*J. F. Alexander,* Attorney General, for Relators.

*Wm. M. Stewart,* for Respondent.

The facts are stated in the opinion.

By the Court, BELKNAP, J.:

This is an amicable proceeding brought for the purpose of testing the validity of an amendment to the constitution authorizing the investment of moneys pledged to educational purposes in the bonds of any of the states of the United States.

Section 1 of article 16 of the constitution prescribes how amendments may be made without calling a convention. It reads as follows: "Any amendment or amendments to this constitution may be proposed in the senate or assembly; and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their respective journals, with the yeas and nays taken thereon, and referred to the legislature then next to be chosen, and shall be published for three months next preceding the time of making such choice. And if, in the legislature next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner, and at such time, as the legislature may prescribe; and if the people shall ap-

prove and ratify such amendment or amendments by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments shall become a part of the constitution."

At the eleventh session of the legislature, the following proposed amendment was agreed to:—

"Resolved by the senate, the assembly concurring, that section 3 of article 11 of the constitution of the state of Nevada be amended so as to read as follows:—

"Sec. 3. All lands, including the sixteenth and thirty-sixth sections in every township, donated for the benefit of the public schools in the act of the thirty-eighth Congress to enable the people of the territory of Nevada to form a state government, the thirty thousand acres of public lands granted by an act of Congress, approved July 2, A. D. 1862, for each senator and representative in Congress, and all proceeds of lands that have been or may hereafter be granted or appropriated by the United States to this state, and also the five hundred thousand acres of land granted to the new states under the act of Congress distributing the proceeds of the public lands among the several states of the Union, approved A. D. 1849, provided that Congress make provisions for or authorize such diversion to be made for the purpose herein contained; all estates that may escheat to the state; all of such per cent as may be granted by Congress on the sale of lands; all fines collected under the penal laws of this state; all property given or bequeathed to the state for educational purposes; and all proceeds derived from any or all said sources shall be, and the same are hereby, solemnly pledged for educational purposes, and shall not be transferred to any other fund for other uses, and the interest thereon shall, from time to time, be apportioned among the several counties in proportion to the ascertained number of the persons between the ages of six and eighteen years in the different counties, and the legislature shall provide for the sale of floating land warrants to cover the aforesaid lands, and for the investment of all proceeds derived from any of the above-mentioned sources in United States bonds or bonds of this state, or the bonds of such other state or states as may be selected by the boards authorized by law to make such investments; provided, that the interest only of the aforesaid proceeds shall be used for educational purposes, and any surplus

interest shall be added to the principal sum; and provided
further, that such portions of said interest as may be necessary
may be appropriated for the support of the state university."

No entry of the proposed amendment was made upon the
journal of either house, and the question presented is whether
or not this omission was fatal to the adoption of the amendment.

An inquiry based upon similar facts and constitutional pro-
visions was recently presented to the supreme court of Iowa.
In pronouncing the amendment invalid, the court employed the
following language, which we adopt: "The object of the pro-
vision [entering the amendment upon the journals] cannot be
doubted or misunderstood. It is to preserve, in the manner
indicated, the identical amendment proposed, and in an au-
thentic form, which, under the constitution, is to come before
the succeeding general assembly. No better mode could have
been adopted, when it is considered that, to be effective, the
proposed amendment must be agreed to by the succeeding gen-
eral assembly. This thought is much strengthened by the
consideration that the proposed amendment is only required to
be entered on the journals of the first general assembly which
acts thereon. This distinction, to our minds, is significant, and
enhances the importance of the constitutional injunction that
the proposed amendment shall be entered on the journals of
both houses of the general assembly which first agrees thereto."
(*Koehler* v. *Hill*, 60 Iowa, 543.)

The court considered the omission fatal, notwithstanding a
vote of the people had approved the proposed amendment, and
declared that, if any provision of the constitution should be
regarded as mandatory, it is when it provides for its own
amendment.

The remarks of Judge Cooley made in considering the con-
struction to be placed upon constitutional provisions are perti-
nent and instructive. He says: "In all we have said upon this
subject, we have assumed the constitutional provision to be man-
datory. * * * The fact is this: That whatever constitu-
tional provision can be looked upon as directory merely is very
likely to be treated by the legislature as if it were devoid
even of moral obligation, and to be therefore habitually disre-
garded. To say that a provision is directory seems, with many
persons, to be equivalent to saying that it is not law at all.

That this ought not to be so must be conceded; that it is so we have abundant reason and good authority for saying. If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory. And, if the legislature habitually disregarded it, it seems to us that there is all the more urgent necessity that the courts should enforce it. And it also seems to us that there are few evils which can be inflicted by a strict adherence to the law so great as that which is done by the habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed." (Cooley, Const. Lim. 183.)

In *Collier* v. *Frierson*, 24 Ala. 108, it appeared that the legislature had proposed eight different amendments to be submitted to the people at the same time. The people had approved them, and all the requisite proceedings to make them a part of the constitution had been had, except that, in the subsequent legislature, the resolution for their ratification had by mistake omitted to recite one of them. On the question whether this one had been adopted, we quote from the opinion of the court: "The constitution can be amended in but two ways, either by the people, who originally framed it, or in the mode prescribed by the instrument itself. If the last mode is pursued, the amendments must be proposed by two thirds of each house of the general assembly; they must be published in print at least three months before the next general election for representatives, it must appear from the returns made to the secretary of state that a majority of those voting for representatives have voted in favor of the proposed amendments; and they must be ratified by two thirds of each house of the next assembly after such election, voting by yeas and nays, the proposed amendments having been read at each session three times on three several days in each house. We entertain no doubt that, to change the constitution by any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done, certain requisitions are to be observed,

before a change can be effected. But to what purpose are those acts required, or those requisitions enjoined, if the legislature, or any department of the government, can dispense with them? To do so would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against any amendment which is not shown to have been made in accordance with the rules prescribed by the fundament law." (Cooley, Const. Lim. 40.)

At the last general election a majority of the electors of the state ratified the amendment, and we are asked at the argument to give this fact such consideration as it may deserve. The suggestion is doubtless based upon the fact that, under our form of government, all political power originates with the people. The bill of rights contained in our constitution declares that " all political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people; and they have the right to alter or reform the same whenever the public good may require it."

In commenting upon reservations of this character, Judge Cooley says: "Although, by their constitutions, the people have delegated the exercise of sovereign powers to the several departments, they have not thereby divested themselves of the sovereignty. They retain in their own hands, so far as they have thought it needful to do so, a power to control the governments they create, and the three departments are responsible to, and subject to be ordered, directed, changed, or abolished by them. But this control and direction must be exercised in the legitimate mode previously agreed upon. The voice of the people, in their sovereign capacity, can only be of legal force when expressed at the times and under the conditions which they themselves have prescribed and pointed out by the constitution, or which, consistently with the constitution, have been prescribed and pointed out for them by statute; and if by any portion of the people, however large, an attempt should be made to interfere with the regular working of the agencies of government at any other time or in any other mode than as allowed by existing law, either constitutional· or statutory, it would be revolutionary in character, and must be resisted and repressed by the officers who, for the time being, represent legitimate government." (Cooley, Const. Lim. 751.)

We conclude that amendments to the constitution can be made only in the mode provided by the instrument itself. A proposed amendment, if agreed to by a majority of each house of the legislature, must be entered upon the journals, so that no doubt may arise as to its provisions. The yeas and nays must be entered in order to ascertain whether the requisite number have agreed to the amendment. It is then to be referred to the next legislature, and is to be published for three months preceding the election, so that the members may, if the people desire, be elected specially to consider it. And finally, the proposed amendment must be submitted by the legislature to a vote of the people. These provisions were intended to secure care and deliberation on the part of the legislature and people, and are exclusive and controlling.

The amendment was not constitutionally adopted. The statute enacted for the purpose of executing its provisions is unconstitutional, and respondent properly refused to comply with its requirements. *Mandamus* denied.