133 Nev., Advance Opinion 16

# IN THE SUPREME COURT OF THE STATE OF NEVADA

HONORABLE CATHERINE RAMSEY, NORTH LAS VEGAS MUNICIPAL JUDGE, Appellant, vs. THE CITY OF NORTH LAS VEGAS; BARBARA A. ANDOLINA, CITY CLERK OF NORTH LAS VEGAS; BETTY HAMILTON; MICHAEL WILLIAM MORENO; AND BOB BORGERSEN, INDIVIDUALLY AND AS MEMBERS OF "REMOVE RAMSEY NOW," Respondents.

No. 68450



FILED

APR 13 2017

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a district court order denying injunctive relief and dismissing an action concerning the recall of a public officer. Eighth Judicial District Court, Clark County; Eric Johnson, Judge.

*Reversed and remanded.*

Mueller Hinds & Associates, Chtd., and Craig A. Mueller and Steven M. Goldstein, Las Vegas,
for Appellant.

Snell & Wilmer, LLP, and Patrick G. Byrne, Richard C. Gordon, and Daniel S. Ivie, Las Vegas,
for Respondents the City of North Las Vegas and Barbara A. Andolina, City Clerk of North Las Vegas.

Gentile, Cristalli, Miller, Armeni & Savarese and Dominic P. Gentile, Colleen E. McCarty, and Ross J. Miller, Las Vegas,
for Respondents Betty Hamilton, Michael William Moreno, and Bob Borgersen, individually and as members of Remove Ramsey Now.

SUPREME COURT
OF
NEVADA

(O) 1947A

17-12192

Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno,
for Amicus Curiae Nevada Judges of Limited Jurisdiction.

BEFORE THE COURT EN BANC.[1]

## OPINION

By the Court, HARDESTY, J.:

In 1976, amid growing concern that no central administrative authority existed to unify Nevada courts and that this state's judges were not being held to uniform and consistent standards, Nevada's voters approved the creation of the Commission on Judicial Discipline (the Commission) through constitutional amendment to provide for a standardized system of judicial governance. This amendment provides for the removal of judges from office as a form of discipline. Thus, in conjunction with the Commission's creation, a new Code of Judicial Conduct was developed with the expectation that these measures would promote judicial independence and political neutrality, while at the same time improving the public's ability to hold judges accountable for their conduct in office.

A group of individuals within the City of North Las Vegas seeks to remove a municipal judge, not through the system of judicial discipline established by the majority of voters in 1976, but through a special recall election. Whether the existing state constitutional provision providing for the recall of "public officers," Article 2, Section 9, applies to judges has not been previously considered by this court. However, even if

_____

[1]The Honorable Lidia S. Stiglich, Justice, did not participate in the decision of this matter.

the recall of public officers provision is interpreted to include judges, we conclude that the voters' subsequent approval of the system for judicial discipline, which plainly grants the Commission the exclusive authority to remove a judge from office with only one exception, the legislative power of impeachment, supersedes any provision that would allow for judges to be recalled by other means.

## FACTUAL AND PROCEDURAL HISTORY

At the 2011 local election, City of North Las Vegas voters elected appellant Catherine Ramsey to a six-year term as a municipal judge. Before Ramsey's term expired, a group called "Remove Ramsey Now"[2] created a recall petition seeking to force an election to remove her from office. The group alleged that Ramsey improperly used city assets for personal use, was excessively absent from work, and mistreated staff and other people in her courtroom.[3] After gathering signatures, Remove Ramsey Now submitted the recall petition for verification to respondent Barbara Andolina, city clerk for respondent City of North Las Vegas.

---

[2]For purposes of this case, Remove Ramsey Now is represented by respondents Betty Hamilton, Michael William Moreno, and Bob Borgersen.

[3]The Commission formally charged Ramsey with judicial misconduct in February 2016. On August 23, 2016, Ramsey and the Commission filed a Stipulation and Order in which Ramsey admitted to various violations of the Nevada Code of Judicial Conduct and consented to discipline including a three-month suspension from office without pay commencing three months prior to the expiration of her current term of office and a bar against seeking reelection to the North Las Vegas Municipal Court in 2017. *See Mack v. Estate of Mack*, 125 Nev. 80, 92, 206 P.3d 98, 106 (2009) (stating that this court may take judicial notice of administrative proceedings when there is a valid reason for doing so).

Sufficient signatures were certified, and the Secretary of State deemed the petition qualified.

Ramsey sought an emergency injunction from the district court and also later filed a complaint challenging the legal sufficiency of the recall petition. Ramsey argued that judges are not "public officers" subject to recall under Article 2, Section 9 of the Nevada Constitution, and that even if they once were, the voters' approval of the judicial discipline process in 1976 superseded all other forms of judicial removal except legislative impeachment. She also asserted that various issues with respect to notice of the signature verification process and the form of the petition violated her constitutional rights and invalidated the petition.

The district court consolidated the two actions. After a two-day evidentiary hearing, the district court denied all of Ramsey's claims, concluding that judges were public officers subject to recall under the Nevada Constitution and that Ramsey's rights ultimately were not violated. Ramsey now appeals.

## DISCUSSION

This court reviews questions of constitutional interpretation de novo. *Lawrence v. Clark Cty.*, 127 Nev. 390, 393, 254 P.3d 606, 608 (2011). In interpreting an amendment to our Constitution, we look to rules of statutory interpretation to determine the intent of both the drafters and the electorate that approved it. *Landreth v. Malik*, 127 Nev. 175, 180, 251 P.3d 163, 166 (2011); *Halverson v. Sec'y of State*, 124 Nev. 484, 488, 186 P.3d 893, 897 (2008). We first examine the provision's language. *Landreth*, 127 Nev. at 180, 251 P.3d at 166. If plain, we look no further, but if not, "we look to the history, public policy, and reason for the provision." *Id.* When so doing, we keep in mind that "a contemporaneous construction by the [L]egislature of a constitutional provision is a safe

guide to its proper interpretation and creates a strong presumption that the interpretation was proper," because it is likely that legislation drafted near in time to the constitutional provision reflects the constitutional drafters' mindset. *Halverson*, 124 Nev. at 488-89, 186 P.3d at 897 (internal quotations omitted); *Porch v. Patterson*, 39 Nev. 251, 260, 156 P. 439, 442 (1916) (Coleman, J., dissenting) (same).

## I.

Voter recall of "public officer[s]" has been available in Nevada since Article 2, Section 9 of the Nevada Constitution was adopted in 1912. In its current form, the article provides, in part, that

> [e]very public officer in the State of Nevada is subject, as herein provided, to recall from office by the registered voters of the state, or of the county, district, or municipality which he represents.

To force a recall election, at least 25 percent of the number of voters voting in the election in which the subject official was elected must sign a petition demanding the public officer's recall and setting forth the reasons therefor. Nev. Const. art. 2, § 9. If the public officer does not resign, a special election must be held. *Id.*

The term "public officer" is not expressly defined in the Nevada Constitution, and no prior judicial decision by this court has considered whether judges are within the scope of Article 2, Section 9. However, other states with similar constitutional provisions have decided, either expressly or impliedly, that "public officers" include judges.

Idaho and Washington each added amendments providing for the recall of "public officers" at around the same time Nevada adopted Article 2, Section 9. *See* Idaho Const. art. VI, § 6 (added 1911, ratified 1912); Wash. Const. art. I, § 33-34 (adopted by amendment 1911, approved 1912). Article VI, Section 6 of Idaho's constitution provides that

"[e]very public officer . . . , excepting the judicial officers, is subject to recall." Similarly, Article I, Section 33 of Washington's constitution provides that "[e]very elective public officer in the state of Washington expect [except] judges of courts of record is subject to recall." (Alteration in original). Idaho's and Washington's explicit exclusion of judges from their respective recall provisions implies that judges are included in the term "public officer."

Arizona, Colorado, and Oregon also adopted constitutional recall provisions around the same time as Nevada, which also use the term "public officer," but did not specifically exclude judicial officers. *See* Ariz. Const. art. VIII, pt. 1, § 1; Colo. Const. art. XXI, § 1; Or. Const. art. II, § 18(1). In each of these states, the courts implicitly concluded that members of the judiciary were considered public officers and thus subject to recall pursuant to their constitutions. *See Abbey v. Green*, 235 P. 150, 152 (Ariz. 1925); *Marians v. People ex rel. Hines*, 69 P. 155, 155 (Colo. 1917); *State ex rel. Clark v. Harris*, 144 P. 109, 110 (Or. 1914).

We, like our sister states, believe that judges are public officers for purposes of Nevada's constitutional recall provision adopted in 1912. However, even if judges originally could be recalled, Ramsey argues that the creation of the Commission in 1976 superseded any such recall authority over judges. We agree.

## II.

### A.

Nevada voters entrusted the Commission with the power to remove judges from office under Article 6, Section 21. In 1967, the Nevada Legislature convened a commission to complete a comprehensive study of the organization and structure of the Nevada court system. Legislative

Commission of the Legislative Counsel Bureau, *Nevada's Court Structure*, Bulletin No. 74, at 23 (1968) (citing S. Con. Res. 18, 54th Leg. (Nev. 1967)).[4] In exploring the election and removal of judges with a view toward promoting an independent judiciary under a uniform court system, the legislative commission recommended modifying the court structure in two major respects. First, it suggested that the system be changed so that judges were appointed, rather than elected. *Id.* at 31-32. Second, the legislative commission recognized that election was also an ineffective and haphazard way to remove judges who were not performing their duties, and that an impartial removal process conducted by an informed, investigative body was necessary. *Id.* at 33-34. The legislative commission believed that a board comprised of laypersons and judges alike should be able to investigate complaints against a judge and would be in a better position to evaluate the performance of a judge and recommend corrective action, if warranted. *Id.* at 33.

Around the same time, various bills in the Legislature introduced the idea of the Commission, a neutral board that would have authority to discipline and remove judges from office. *See* Hearing on A.J.R. 5 Before the Assembly Judiciary Comm. 54th Leg. (Nev., March 29, 1967) (no action—held for future bill); Hearing on S.J.R. 23 Before the Senate Judiciary Comm., 55th Leg. (Nev., March 20, 1969) (complete revision of Article 6, defeated by the voters in 1972); Hearing on S.J.R. 23 Before the Senate Judiciary Comm., 56th Leg. (Nev., January 19, 1971) (same); Hearing on A.J.R. 16 Before the Assembly Judiciary Comm., 57th

---

[4]*Nevada's Court Structure*, Bulletin No. 74, is *available at* https://www.leg.state.nv.us/Division/Research/Publications/InterimReports/1969/Bulletin074.pdf.

Leg. (Nev., March 6, 1973) (proposed creating the Commission only); Hearing on A.J.R. 16 Before the Assembly Judiciary Comm., 58th Leg. (Nev., May 6, 1975) (same; enrolled and delivered to Secretary of State and approved by voters in 1976). Although the voters rejected a large-scale revision of the court structure in 1972, including a plan to appoint judges, they individually approved several aspects of that revision in 1976, including vesting this court with authority over all other Nevada courts and the creation of the Commission. Nev. Const. art. 6, §§ 19, 21.

As enacted in 1976, Article 6, Section 21(1) states, in relevant part, as follows:

> A justice of the [S]upreme [C]ourt, a district judge, a justice of the peace or a municipal judge may, *in addition to the provision of Article 7 for impeachment*, be censured, retired, removed or otherwise disciplined by the commission on judicial discipline.

(Emphasis added.)[5] The emphasized language providing the single exception—for impeachment by the Legislature under Article 7—is, Ramsey asserts, proof that all other means of removing judges were superseded when the Nevada Constitution was amended to create the Commission.

To solidify the process of judicial discipline, along with the Commission as the enforcer of such discipline, work began in 1975 to create a comprehensive and enforceable code of judicial conduct, fashioned after the model code adopted by the American Bar Association. Hearing on S.B. 453 Before the Assembly Judiciary Comm., 59th Leg. (Nev., April

---

[5]Article 6, Section 21 was amended in 2015 to include judges on the newly created court of appeals.

20, 1977). The resulting Nevada Code of Judicial Conduct (NCJC) was adopted in 1977. NCJC (1977). Testimony during the legislative hearing confirmed that the NCJC was intended to further the Legislature's goals of unifying the court system in an arrangement under which all judges were held to the same standards, enforced by the Commission and this court. Hearing on S.B. 453 Before the Assembly Judiciary Comm., 59th Leg. (Nev., April 20, 1977) (testimony of Judge Richard Minor, President, Nevada Judges Association); *see also* Hearing on S.B. 453 Before the Senate Judiciary Comm., 59th Leg. (Nev., April 13, 1977) (Ex. B, letter from Justice E.M. Gunderson to Governor Mike O'Callaghan).[6]

The legislative history demonstrates that, at the time Article 6, Section 21 was approved by the voters, the Commission was viewed as integral to protecting the judiciary's independence throughout the unified court system by providing a means by which all judges would be held to objective, established standards enforced in a consistent manner. Given this history and the seemingly intentional decision by the Legislature as

---

[6]The dissent relies on a Legislative Counsel Bureau (LCB) report from 1981 suggesting that the purpose of creating the Commission was to rectify the shortcomings of other methods of judicial removal, not to supersede recall. Nev. Legis. Couns. Bureau, Res. Div., *Judicial Discipline* 1, 2 (Nev. Div. Res. Publ'ns, Background Paper No. 81-8, 1981), https://www.leg.state.nv.us/Division/Research/Publications/Bkground/BP81-08.pdf. The LCB was commenting on the ineffectiveness of recall as a means of removal. *Id.* at 1. It was noted that the judicial branch was to some extent dependent on the other branches of government and that judges were not completely independent from public control. *Id.* at 3. Proponents viewed judicial discipline commissions as a way to free the judiciary from these influences while also holding judges accountable for their conduct. *Id.* This comports with our conclusion today that the removal of judges from office, other than through impeachment, falls solely within the province of the Commission.

SUPREME COURT
OF
NEVADA

(O) 1947A

the drafters of the constitutional amendment to omit any reference to recall in Article 6, Section 21, the provision must be read as the exclusive means of judicial removal except for legislative impeachment.

## B.

On its face, Article 6, Section 21 expressly retains legislative impeachment as a means of removal but does not mention the Article 2, Section 9 recall provision. We are compelled to conclude that Article 6, Section 21 can be read no way other than as providing the exclusive means for judicial removal except for impeachment without defeating the very reasons for its adoption.

As noted above, Article 6, Section 21 provides for a comprehensive, standardized system for removing judges who violate their ethical and judicial performance duties, while expressly maintaining a singular exception for the Legislature to remove a judge from office through impeachment proceedings. No other method of removal is retained.[7]

As a result, the maxim *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of another"), long adhered to in this state, instructs us to view the failure to acknowledge any other existing method of removal as intent to allow no other method. *Galloway v. Truesdell*, 83 Nev. 13, 26, 422 P.2d 237, 246 (1967) ("Every positive

---

[7]The dissent maintains that Article 6, Section 21 only contemplates *for cause* removals and therefore does not supersede the recall provision permitting the removal of judicial officers for any reason. However, the legislative history of Article 6, Section 21, which clearly catalogs the drafters' efforts to subject judges to the consistent enforcement of uniform standards of conduct, is inconsistent with distinguishing *for cause* removals from *not for cause* removals.

 

direction contains an implication against anything contrary to it which would frustrate or disappoint the purpose of that provision." (quoting *State ex rel. Keyser v. Hallock*, 14 Nev. 202, 206 (1879) (internal quotations omitted))); *see also State ex rel. Josephs v. Douglass*, 33 Nev. 82, 95, 110 P. 177, 181 (1910) ("We think the maxim '*Expressio unius est exclusio alterius*,' clearly applicable, and that the [C]onstitution by specifically designating certain particular offices of a particular class which may be consolidated, etc., intended to exclude from such provisions all other constitutional offices."), *overruled on other grounds by State ex rel. Harvey v. Second Judicial Dist. Court*, 117 Nev. 754, 765, 32 P.3d 1263, 1270 (2001); *Goldman v. Bryan (II)*, 106 Nev. 30, 37, 787 P.2d 372, 377 (1990) (noting "the 'well-recognized rule that an express constitutional provision requiring a certain thing to be done in a certain way is exclusive to like extent as if it had included a negative provision to the effect that it may not be done in any other way'" (quoting *Robison v. First Judicial Dist. Court*, 73 Nev. 169, 175, 313 P.2d 436, 440 (1957))); *State ex rel. O'Connell v. Slavin*, 452 P.2d 943, 946 (Wash. 1969) ("For purposes of constitutional interpretation, the express mention of one thing implies the exclusion of another which might logically have been considered at the same time."). Any existing authority to recall judges was thus superseded by the centralized system to hold all judges equally accountable to the public previously discussed.

This interpretation is supported by contemporaneous legislation. As Ramsey points out, in 1977, the Legislature enabled Article 6, Section 21 by enacting NRS 1.440, which provided, in pertinent part, that "[t]he commission on judicial discipline has exclusive jurisdiction over the censure, removal and involuntary retirement of justices of the peace

SUPREME COURT
OF
NEVADA

(O) 1947A

and judges of municipal courts which is coextensive with its jurisdiction over justices of the supreme court and judges of the district courts." 1977 Nev. Stat., ch. 471, § 1, at 936-37. That same legislation excluded judges from the purview of NRS 283.440, which governs the removal of public officers from office. *Id.* at 937. This contemporaneous legislation strongly suggests that the Legislature, as the drafter of Article 6, Section 21, intended that process to be exclusive. *Halverson v. Sec'y of State*, 124 Nev. 484, 488-89, 186 P.3d 893, 897 (2008). Accordingly, as the Legislature recognized in NRS 1.440, Article 6, Section 21 must be read to exclude recall as a means of removing a judge from office.[8]

Contrastingly, the Oregon Constitution has provided for the right of its citizens to recall "public officer[s]" since 1908. Or. Const. art. II, § 18(1) (1908) (enacted). In 1967, the Oregon Legislature created a Commission on Judicial Fitness and Disability, giving it authority to investigate a judge's conduct and recommend removal to the Oregon Supreme Court. Or. Rev. Stat. §§ 1.410, 1.420 (1967). And the Oregon Constitution was amended at the same time to provide that its supreme court could remove a judge from office "[i]n the manner provided by law." Or. Const. art. VII, § 8(1) (1968) (amended). Unlike Nevada, however, Oregon's voters approved express language acknowledging that the supreme court's removal power coexisted with the citizens' recall power. Or. Const. art. VII, § 8(2). If the Nevada amendment was intended by the

_____

[8]The Commission's disciplinary decisions are subject to review by this court. Nev. Const. art. 6, § 21(1). Nothing in this opinion detracts from this court's authority over the conduct of Nevada judges. *See Lueck v. Teuton*, 125 Nev. 674, 677, 219 P.3d 895, 897 (2009) (noting that courts have the power to administrate justice, supervise judicial authority, and preserve judicial integrity).

SUPREME COURT
OF
NEVADA

(O) 1947A

Legislature to maintain any recall power over judges, we presume that it, too, would expressly say so, as the amendment did with respect to the legislative impeachment power.[9] *Dep't of Taxation v. DaimlerChrysler Servs. N. Am., LLC,* 121 Nev. 541, 548, 119 P.3d 135, 139 (2005) ("[O]missions of subject matters from statutory provisions are presumed to have been intentional.").

## C.

Our precedent also permits us to consider *expressio unius* when determining whether an earlier enacted provision is repealed based on an omission from a later enacted provision. In *Thomas v. Nevada Yellow Cab Corp.*, we considered the effect that the constitutional minimum wage amendment's enactment had on NRS 608.250(2)'s longstanding explicit exemption of taxicab drivers from minimum wage requirements. 130 Nev., Adv. Op. 52, 327 P.3d 518, 521 (2014). In relying on *expressio unius,* we noted that the amendment provided for several exemptions from minimum wage but omitted any reference to a taxicab exemption. *Id.* We therefore concluded that because of this omission, the amendment must be interpreted as excluding any exemption for taxicab

---

[9]In 1970, the Arizona Constitution was amended to create a Commission on Judicial Conduct that had the authority to investigate judicial conduct and to recommend the removal of Arizona judges from office. *See Jett v. City of Tucson,* 882 P.2d 426, 429 (Ariz. 1994). In *Jett,* an appeal questioning whether the Commission's authority over magistrates annulled the City's power to remove a magistrate from office, the court recognized that the Commission's adoption did not divest "the citizens of their power of recall." *Id.* at 431. However, the Arizona recall provision does not indicate that other removal methods are invalid, as Nevada's does through express continuation of the impeachment power, compelling the implicit negation of any other removal powers.

SUPREME COURT
OF
NEVADA

(O) 1947A

13

drivers, and thus inconsistent with and impliedly repealing NRS 608.250(2)'s taxicab driver exemption.[10] *Id.*

Furthermore, the conclusion here is more restrained than in *Thomas*, as there exists no certainty that the Legislature and the electorate in 1976 viewed the recall provision as applying to judges. Instead, only a *potential but uncertain interpretation* of Article 2, Section 9 is addressed. In so reading the provisions, we harmonize the Nevada Constitution by rejecting an application of Article 2, Section 9 that would be inconsistent with the later enacted language of Article 6, Section 21. *See We People Nev. ex rel. Angle v. Miller*, 124 Nev. 874, 881, 192 P.3d 1166, 1171 (2008) ("[T]he interpretation of a statute or constitutional provision will be harmonized with other statutes or provisions.").

As we stated in *Perry v. Terrible Herbst, Inc.*, 132 Nev., Adv. Op. 75, 383 P.3d 257, 260 (2016), a newer provision impliedly supersedes the older when "the two are irreconcilably repugnant, such that both cannot stand." (internal quotation marks omitted). According to the dissent, judicial recall under Article 2, Section 9 can be read harmoniously with Article 6, Section 21. However, such an interpretation would frustrate the purpose of a uniform code of judicial conduct and the creation of the Commission. Whereas the Commission's purpose is to be consistent, public opinion rarely is; instead, conduct that may yield a recall in one district may not do the same in another. The dissent correctly points out that recall is unique because it allows voters to initiate removal for cause

---

[10]The dissenting justices disapprove of our consideration of *expressio unius* in rendering our decision. However, it should be noted that both dissenting justices approved of our use of this widely accepted canon of construction when they joined in the majority in *Thomas*.

they alone decide. Such a result is precisely what the creation of the Commission was intended to avoid. Thus, Article 6, Section 21 cannot stand alongside judicial recall under Article 2, Section 9.

The dissent also points to the ballot materials that accompanied the proposed amendment creating the Commission for the proposition that voters unwittingly gave up their recall power. Those materials provided:

> A majority vote of "yes" would amend article 6 by adding a new section to the article. The new section would provide for the establishment of a Commission on Judicial Discipline which would be empowered to censure, retire, or remove justices or judges. Grounds for censuring justices or judges would be determined by rules by the Supreme Court. *Justices and judges could not be removed except for willful misconduct, willful or persistent failure to perform the duties of their offices or habitual intemperance.* Justices or judges could not be retired except for advanced age which interferes with the proper performance of their judicial duties, or for mental or physical disabilities which prevent the proper performance of their judicial duties and which are likely to be permanent in nature.

State of Nev. Dep't of State, Constitutional Amendments to be Voted Upon in State of Nevada at General Election, 57th and 58th Sess., at 15-17 (available at Nevada Legislative Counsel Bureau Research Library) (emphasis added). As the ballot materials suggest, voter recall was affirmatively supplanted by removal through the Commission.

This vote in favor of Commission removal reflects the unique status of the judiciary vis-à-vis other elected officials. The process and manner by which judicial officers are elected is unique among elected officials. Unlike those seeking legislative or executive office, those seeking

election to the judiciary must remain largely apolitical: judges and judicial candidates are forbidden from acting "as a leader in, or hold[ing] office in, a political organization," "mak[ing] speeches on behalf of a political organization," "publicly endors[ing] or oppos[ing] a candidate for any public office," "solicit[ing] funds for a political organization or candidate for public office," "publicly identify[ing] himself or herself as a candidate of a political organization," or "seek[ing], accept[ing], or us[ing] endorsements or publicly stated support from a political organization." NCJC, Canon 4, Rule 4.1(A)(1)-(7). As noted in the commentary:

> Even when subject to public election, a judge plays a role different from that of a legislator or executive branch official. Rather than making decisions based upon the expressed views or preferences of the electorate, a judge makes decisions based upon the law and the facts of every case. Therefore, in furtherance of this interest, judges and judicial candidates must, to the greatest extent possible, be free and appear to be free from political influence and political pressure.

*Id.* cmt. [1].

Also, the role of the judiciary is fundamentally different from those of the executive or legislative branches. "The judicial department in the United States is subservient to only the Federal Constitution, the established law of the land, and, if a state judiciary, the state constitution." 16 C.J.S. *Constitutional Law* § 387 (2016) (citing *White v. State*, 47 So. 2d 863 (Fla. 1950); *Petition of Florida State Bar Ass'n*, 40 So. 2d 902 (Fla. 1949); *People v. Spegal*, 125 N.E.2d 468 (Ill. 1955); *People v. Scher*, 349 N.Y.S.2d 902 (N.Y. Sup. Ct. 1973)). Thus, while the role of the executive and legislative branches is to effect the will of the electorate, the

role of the judiciary is, ultimately, to uphold and defend by rule of law the federal and Nevada Constitutions.

Finally, the dissent suggests that our conclusion divests the voters of their political power as secured by the Nevada Constitution. However, the voters exercised that very power when they voted to add Article 6, Section 21 to the Nevada Constitution. Through establishment of the Nevada Commission on Judicial Discipline, Nevada voters effectively created a regulatory body with oversight and power the likes of which are unique to the Nevada judiciary. Neither the legislative nor executive branch is subject to the same constitutionally mandated scrutiny as is the judiciary after the adoption of Article 6, Section 21. Thus, by approving the creation of the Commission, Nevada voters secured their interests in judicial oversight by establishing a governing body equipped to undertake the task.

In sum, we acknowledge that Nevada's judges were subject to voter recall under Article 2, Section 9 as that provision was enacted in 1912. However, the subsequent enactment of Article 6, Section 21 superseded voter recall of judicial officers under the Nevada Constitution. First, the legislative history indicates that creation of the Commission was intended to supplant other forms of judicial removal, save legislative impeachment. Second, Article 2, Section 9 and Article 6, Section 21 can be read harmoniously only if the latter is read to supersede the former with respect to judges. Thus, we must read Article 6, Section 21 as repealing voter recall of judicial officers. Finally, the ballot materials, legislative history, and public policy concerns behind Article 6, Section 21 highlight the importance of insulating the judicial branch from political influences,

SUPREME COURT
OF
NEVADA

(O) 1947A

17

a prerogative that cannot be accomplished if voter recall of judicial officers under Article 2, Section 9 is read to have survived the 1976 amendment.

## CONCLUSION

Based on the language and legislative history of the 1976 amendment implementing a central, uniform, and objective process for removing a judge from office, which expressly provides for the continuation of only one other removal method, we conclude that the drafters of the constitutional amendment and the electorate who approved it intended that recall no longer be an available means of removing a judge from office. Accordingly, the recall petition against Ramsey is invalid, and we reverse the district court's order.[11] Ramsey is entitled to an injunction preventing Remove Ramsey Now and the City of Las Vegas from proceeding with the recall election, and we thus remand this matter to the district court for further proceedings consistent with this opinion.

_____, J.
Hardesty

We concur:

_____, C.J.
Cherry

_____, J.
Gibbons

_____, J.
Parraguirre

---

[11]In light of this conclusion, we need not reach Ramsey's arguments concerning notice and the recall petition's validity.

PICKERING, J., with whom DOUGLAS, J., agrees, dissenting:

Nevada voters have the power to recall an elected judge. Article 2, Section 9 of the Nevada Constitution states: "Every public officer in the State of Nevada is subject, as herein provided, to recall by the registered voters." By its plain terms, this provision applies to judges equally with every other public officer in Nevada. That judges are also subject to discipline, up to and including removal from office, by the Nevada Commission on Judicial Discipline, Nev. Const. art. 6, § 21, does not exempt them from recall under Article 2, Section 9.

The conflict the majority contrives between citizen recall and Commission discipline is just that: contrived. Nothing—not text, context, history, the ballot materials the voters received, or the pronouncements of this court and Nevada's lead constitutional scholars—supports that our citizens gave up the right to recall judges when they approved the creation of the Judicial Discipline Commission. Citizen recall and Commission discipline can and do coexist, both in our Constitution and in the constitutions of other states with recall and judicial discipline provisions like ours, including California on whose constitution Nevada relied in creating our Judicial Discipline Commission.

Reasonable minds differ, and have historically differed, on the wisdom of subjecting judges to election and recall. Be that as it may, our job as judges is to enforce the Nevada Constitution as written. Whether the members of this court agree or disagree with the policy choices reflected in the Constitution, we may not, under the guise of interpretation, add or subtract words from its text to change its plain meaning. For the majority to revise the Constitution to exempt themselves and the rest of the Nevada judiciary from our citizens'

constitutional right of recall sets dangerous interpretive precedent, from which I dissent.

## I.

The question presented is whether an elected municipal court judge is a "public officer" whose recall Article 2, Section 9 allows. "In interpreting Article 2, Section 9, we . . . 'are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Strickland v. Waymire*, 126 Nev. 230, 234, 235 P.3d 605, 608 (2010) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008)). "It must be very plain—nay, absolutely certain—that the people did not intend what the language they have employed, in its natural signification, imports, before a Court will feel itself at liberty to depart from the plain reading of a constitutional provision." *State v. Doron*, 5 Nev. 399, 412 (1870) (internal quotation omitted).

## A.

A straightforward reading of Article 2, Section 9 is that it includes judges when it says:

> Every public officer in the State of Nevada is subject, as herein provided, to recall from office by the registered voters of the state, or of the county, district, or municipality which he represents.

*Merriam-Webster* defines "every" as "each individual or part of a group without exception." *Every, Merriam-Webster's Collegiate Dictionary* (11th ed. 2007). A "judge" is "[a] public official appointed or elected to hear and decide legal matters in court." *Judge, Black's Law Dictionary* (10th ed. 2014). And an "officer" is "[a] person who holds an office of trust, authority or command. In public affairs, *the term refers esp. to a person holding public office under a national, state or local government, and*

SUPREME COURT
OF
NEVADA

(O) 1947A

*authorized by that government to exercise some specific function."* *Id.,* *Officer* (emphasis added).

Giving its words their normal and ordinary meaning, Article 2, Section 9 includes judges among the public officers it subjects to recall.

B.

The majority does not analyze Article 2, Section 9's text, or explain how its words can fairly be read to exclude judges. Instead, it concedes that, as originally enacted, Article 2, Section 9 *may* have applied to judges, majority opinion *ante* at 3, 6, 14, then hedges its concession by disparaging this reading as "only a *potential but uncertain interpretation* of Article 2, Section 9." *Id.* at 14 (emphasis in original). But history demonstrates no uncertainty: The Nevadans who adopted Article 2, Section 9 knew that it subjected judges to recall and adopted it with that express understanding in mind.

Nevada added Article 2, Section 9 to its Constitution in 1912. At the time, "the 'progressive' movement for giving the people closer control over the laws and officials was especially strong in many Western states," Nevada among them. Don W. Driggs, *The Constitution of the State of Nevada: A Commentary,* at 29 (1961). Believing that "voters should have [the] power to bypass or countermand elected officials," W. Richard Fossey, *Meiners v. Bering Strait School District and the Recall of Public Officers: A Proposal for Legislative Reform,* 2 Alaska L. Rev. 41, 42 (1985), "states began building into their constitutions opportunities for direct lawmaking by the citizen voters themselves," including provisions that "allowed voters to recall state legislators, as well as state executive and judicial officers." Vikram Amar, *The 20th Century—The Amendments and Populist Century,* 47 Fed. Law. 32, 35 (May 2000).

In 1908 Oregon became the first state to place a recall provision in its constitution. Fossey, *supra*, at 42. Arizona, California, Colorado, Idaho, Washington, and Nevada soon followed. *Id.*; *see* Ariz. Const. art. VIII, pt. 1, § 1 (1912); Cal. Const., Art. 23 (1911, amended and recodified as Cal. Const. art. II, §§ 13-14 (1976)); Colo. Const. art. XXI, § 1 (added 1913); Idaho Const. art. VI, § 6 (added 1911, ratified 1912); Wash. Const. art. I, § 33-34 (adopted by amendment 1911, approved 1912); Nev. Const. art. 2, § 9 (added 1912, amended 1970 and 1996). These recall provisions mirrored one another in that each used "public officer" to describe whom the voters can recall. But they differed when it came to judges: Idaho and Washington expressly exempted judges from recall. Idaho Const. art. VI, § 6 ("[e]very public officer . . . , *excepting the judicial officers*, is subject to recall") (emphasis added); Wash. Const. art. I, § 33 ("[e]very elective public officer in the state of Washington *expect [except] judges of courts of record* is subject to recall") (alteration in original; emphasis added). The other states, Nevada included, subjected "every public officer" to recall, without exception. Ariz. Const. art. VIII, pt. 1, § 1 ("[e]very public officer in the State of Arizona . . . is subject to recall"); Cal. Const. art. 23, § 1 ("[e]very elective public officer of the State of California may be removed from office at any time by the electors"); Colo. Const. art. XXI, § 1 ("[e]very elective public officer of the state of Colorado may be recalled from office at any time"); Or. Const. art. II, § 18(1) ("[e]very public officer in Oregon is subject, as herein provided, to recall").

This difference in form reflected a deep philosophical divide. *See* Driggs, *supra*, at 29 (noting that "[t]he application of recall to judges [was] a very controversial issue"). Those opposed to allowing voters to recall judges objected "that a judge might be recalled because of unpopular

decisions and not because he has proved himself incompetent," *id.*, and that "the common use of this method of removal would tend to drag [judges] into politics." A.J. Maestretti & Charles Roger Hicks, *The Constitution of the State of Nevada, Its Formation and Interpretation*, 34 U. Nev. Bull., Dec. 2, 1940, at 43. Proponents of judicial recall responded:

> The judiciary is but an agency of government created by the people for their service, and if its members fail to serve this purpose and prove dishonest, incapable, or indifferent to their duties or to the rights of the people, the people should have the right to remove them . . . . The people now elect the judges, in the first instance . . . ; why should they not have the power to remove them after they have been tried and found wanting? In fact, every reelection of a judge is in the nature of a recall.

Cal. Sen. Const. Am. No. 23, Recall by the Electors of Public Officials, Ballot Materials, "Reasons Why Senate Constitutional Amendment No. 23 Should Be Adopted" (1911), available at http://repository.uchastings.edu/ca_ballot_props/8.

The debate moved to the national stage in 1911, when then-President, later-Chief Justice, Taft vetoed Arizona's statehood request because its charter subjected judges to voter recall. *See* Eleanore Bushnell & Don W. Driggs, *The Nevada Constitution: Origin and Growth* 125 (5th ed. 1980). In response, "Arizona deleted the clause that had offended the president, was admitted to the Union, and then restored the clause providing for recall of judges!" *Id.; see* Jana Bommersbach, *How Arizona Almost Didn't Become a State* (Feb. 13, 2012), available at http://archive.azcentral.com/arizonarepublic/news/articles/20120130arizona-centennial-state-fight.html. Arizona readopted its public officer recall provision on November 5, 1912. Ariz. Const. art. VIII,

Supreme Court
OF
Nevaoa

(O) 1947A

pt. 1, § 1 (approved Nov. 5, 1912, eff. Dec. 5, 1912). This was the same day Nevadans voted by a 9:1 margin to add Article 2, Section 9 to the Nevada Constitution, George Brodigan, *Nevada Secretary of State Official Returns of the Election of November 1912* (certifying Article 2, Section 9 passed 9636 to 1173), over strenuous opposition from the Nevada and American Bar Associations and a leading Nevada newspaper. *See Don't Favor the Recall*, Carson City Daily Appeal, July 26, 1912, at 4 (urging Nevadans to reject Article 2, Section 9 because it allowed judges to be recalled, which the Nevada Bar Association opposed); Joel B. Grossman, *Lawyers and Judges: The ABA and the Politics of Judicial Selection* 53 (1965) (describing the ABA's campaign against judicial recall provisions as an "intense, vituperative, almost hysterical propaganda offensive").

There was, in sum, nothing "uncertain" or "potential" about Article 2, Section 9's application to judges when it was adopted or thereafter. And, soon after adopting their comparable provisions, Arizona, Colorado, and Oregon applied them to judges, and no one, not even the targeted judges, disputed that judges were "public officers" and subject to recall. *See Abbey v. Green*, 235 P. 150, 151 (Ariz. 1925); *Marians v. People ex rel. Hines*, 169 P. 155, 155 (Colo. 1917); *State ex rel. Clark v. Harris*, 144 P. 109, 110 (Or. 1914).

## II.

### A.

In 1976, Nevada amended its Constitution to create the Commission on Judicial Discipline and empower it to censure, remove, or otherwise discipline judges for misconduct. Nev. Const. art. 6, § 21. The amendment contained no repealing clause or other provision purporting to repeal or amend Article 2, Section 9 in whole or in part. Citing the "implied repeal" doctrine, the majority nonetheless posits that Article 6,

Section 21 *impliedly*—that is to say, silently—amended Article 2, Section 9, so that now Nevada has the Idaho/Washington form of public-officer recall provision, which excludes judges, instead of the Arizona/California/Colorado/Oregon form, which applies to all public officers, judges included. Majority opinion *ante* at 6, 17, 18. In effect, the majority has rewritten Article 2, Section 9 to add the words shown in italics, as follows: "Every public officer in the State of Nevada *except judges and justices* is subject, as herein provided, to recall."

Judges do not have the authority to rewrite unambiguous constitutional text this way. A constitution, including its amendments, is "one instrument, all of whose provisions are to be deemed of equal validity." *Prout v. Starr*, 188 U.S. 537, 543 (1903). "Nothing new can be put into the Constitution except through the amendatory process [and n]othing old can be taken out without the same process." *Ullmann v. United States*, 350 U.S. 422, 428 (1956); *see* Nev. Const. art. 16, §§ 1 and 2, art. 19 § 2 (specifying how citizens can amend the Nevada Constitution); *Stevenson v. Tufly*, 19 Nev. 391, 391-92, 12 P. 835, 835-36 (1887) (the Constitution cannot be amended except by following the procedures it prescribes). Once amended, "the Constitution, including all amendments thereto, must be construed as one instrument, and as a single enactment," as if the entire document had been enacted at one time. *People v. Field*, 181 P. 526, 527 (Colo. 1919). "As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion." *Ullmann*, 350 U.S. at 428.

The "implied repeal" doctrine, on which the majority relies to justify its revision of Article 2, Section 9, has never been applied to give one provision of the Nevada Constitution preeminence over another. *See*

Supreme Court
of
Nevada

(O) 1947A

7

*Bowens v. Superior Court*, 820 P.2d 600, 607 (Cal. 1991) ("a constitutional provision generally should not be construed to impliedly repeal another constitutional provision"). The doctrine normally applies to statutory interpretation, where an older, preexisting statute is argued to have been impliedly repealed by a later-adopted statute or constitutional provision with which it irreconcilably conflicts. *Thomas v. Nev. Yellow Cab Corp.* 130 Nev., Adv. Op. 52, 327 P.3d 518, 521 (2014) (holding the Minimum Wage Amendment, Nev. Const. art. 15, § 16, directly conflicted with, and therefore impliedly repealed, a preexisting statute). And, even in the statutory arena, "[r]epeals by implication are disfavored—very much disfavored." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 327 (2012) (internal quotation omitted); *accord Washington v. State*, 117 Nev. 735, 739, 30 P.3d 1134, 1137 (2001) (describing implied repeals as "heavily disfavored").

"An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003), *quoting Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). Arguable inconsistency will not do. The earlier and later enactment must be "irreconcilably repugnant, such that both cannot stand," *Perry v. Terrible Herbst, Inc.*, 132 Nev., Adv. Op. 75, 383 P.3d 257, 260 (2016), or "logically coexist," *Thomas*, 130 Nev., Adv. Op. 52, 327 P.3d at 521. Even if "different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative," especially when interpreting a written constitution. Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest Upon the Legislative Power of the*

SUPREME COURT
OF
NEVADA

(O) 1947A

8

*States of the American Union* 58 (1868); Scalia & Garner, *supra*, at 180 ("there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously"); *accord Nevadans for Nevada v. Beers*, 122 Nev. 930, 944, 142 P.3d 339, 348 (2006) ("the Nevada Constitution should be read as a whole, so as to give effect to and harmonize each provision"). Last, for an implied repeal to be found, the intention to repeal must be "clear and manifest." *Posadas*, 296 U.S. at 503.

## B.

Textually, the majority builds its entire implied-recall case on subparagraph (1) of Article 6, Section 21, which states: "A justice of the Supreme Court . . . , a district judge, a justice of the peace or a municipal judge may, *in addition to the provision of Article 7 for impeachment*, be censured, retired, removed or otherwise disciplined by the Commission on Judicial Discipline." (Emphasis added.) Because this subparagraph specifies the Commission's removal powers are "in addition to the provision of Article 7 for impeachment," the majority writes that it feels itself "compelled to conclude that Article 6, Section 21 can be read no other way than as providing the exclusive means for judicial removal except for impeachment without defeating the very reasons for its adoption." Majority opinion *ante* at 10.[1] Hyperbole aside, the majority misses the

---

[1]Besides the "implied repeal" doctrine, the majority cites the maxim *expressio unius est exclusio alterius*—the expression of one thing is the exclusion of another—to support its revision of Article 2, Section 9. *Id.* at 10. But maxims, including this one, "are susceptible of being applied, and indeed are often ingeniously applied, to the subversion of the text, and the objects of the instrument. . . . In relation . . . to such a subject as a constitution, the natural and obvious sense of its provisions, apart from

*continued on next page . . .*

SUPREME COURT
OF
NEVADA

(O) 1947A

obvious: Commission discipline under Article 6, Section 21 and impeachment by the Legislature under Article 7, Section 2 resemble, and are "in addition to," one another in that each provides a method whereby the government can remove judges for willful misconduct. They have nothing to do with, and do not impinge, the citizens' right under Article 2, Section 9 to recall judges, equally with any other public officer. So construed, the provisions do not conflict; they harmonize.

There are "four methods by which a . . . justice or . . . judge may be removed from office during a term." Bushnell & Driggs, *supra*, at 123. Two are, to be sure, those mentioned in Article 6, Section 21(1): impeachment by the Legislature "for Misdemeanor or Malfeasance in Office," Nev. Const. art. 7, § 2; and removal by the Judicial Discipline Commission for "willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance," *id.* art. 6, § 21(8)(a). But the Constitution provides, *in addition*, for judges to be removed by legislative address, *id.* art. 7, § 3,[2] and to be recalled by the voters

---

. . . *continued*

any technical or artificial rules, is the true criterion of construction." 1 Joseph Story, *Commentaries on the Constitution of the States* § 448, at 319-20 (1851) (footnote omitted).

[2]Removal by address originated in England and refers to the removal of judges by joint address (resolution) of both houses of parliament. Burke Shartel, *Retirement and Removal of Judges*, 20 J. of the Am. Judicature Soc'y 133, 146-47 (1936). Nevada provided for removal of judges both by impeachment, Nev. Const. art 7, § 2, and legislative address *id.* art. 7, § 3, after contentious constitutional debate. Andrew J. Marsh, *Official Report of the Debates and Proceedings in the*

*continued on next page . . .*

pursuant to Article 2, Section 9. Last, although not a removal method per se, Article 6, Section 17 deems a judge who is absent from the State of Nevada for more than 90 days to have vacated office, empowering the Governor to fill the seat. Nev. Const. art. 6, § 20.

If Article 6, Section 21(1) repeals all judicial removal provisions except impeachment and discipline, as the majority holds, not only does Article 2, Section 9 have to be amended to exclude judges and justices, Article 7, Section 3, providing for removal by legislative address and, arguably, Article 6, Sections 17 and 20, dealing with a judge's departure from the State, need to be repealed. A more benign reading—that requires no judge-made changes to any constitutional text—recognizes that impeachment by the Legislature under Article 7, Section 2, and removal by the Commission under Article 6, Section 21(8) overlap: Each targets misbehavior by a judge while in office, authorizing removal only for malfeasance, willful misconduct, or willful or persistent dereliction of duty; the grounds must be proved at a hearing or trial; and the process is initiated and controlled by the government, not the voters. These similarities make it appropriate to specify that Legislative impeachment and Commission removal are "in addition to" each other, to avoid argument that one preempts or excludes the other.

Unlike removal via impeachment or discipline, recall is initiated by the voters, for cause they alone decide. While a recall petition

---

. . . *continued*

*Constitutional Convention of the State of Nevada*, Impeachment and Removal, at 541-65 (1866).

must state "the reasons why such recall is demanded," Nev. Const. art. 2, § 9, such statement need not

> ... suggest misfeasance, nonfeasance or malfeasance. All that is demanded is that "the" reason be stated. The merit of that reason as grounds for removal is for the electorate to determine, not the court. The reason, in whatever manner expressed, presents a political issue for resolution by vote, not a legal question for court decision.

*Batchelor v. Eighth Judicial Dist. Court*, 81 Nev. 629, 633, 408 P.2d 239, 241 (1965). Similarly, Article 7, Section 3's provision for removal by legislative address allows a justice or judge to be removed "[f]or any reasonable cause, to be entered on the journal of each House [of the Legislature], which may or may not be sufficient grounds for impeachment."

Limiting Article 6, Section 21(1)'s "in addition to" clause as I propose also avoids a separate constitutional dilemma, which the majority's reading creates but does not acknowledge: In 2014, Nevadans approved amending the Constitution to create a court of appeals; in doing so, they also amended Article 7, Section 3, which permits supreme court justices and district court judges to be removed by legislative address, adding court of appeals judges to those who can be removed by this means. *See* 2014 Ballot Question No. 1: Senate Joint Resolution 14 (76th Session), http://nvsos.gov/sos/elections/initiatives-referenda/petition-archive/2014-petitions. If all methods of removing judges except legislative impeachment and Commission removal were repealed when voters approved Article 6, Section 21 in 1976, there would have been nothing left of Article 7, Section 3 to amend in 2014. It would have died in 1976, and could not have been revivified by amendment in 2014. *Cf.*

*Jackson v. State*, 93 Nev. 677, 681, 572 P.2d 927, 930 (1977) (declining to find an implied repeal where the statute argued to have been impliedly repealed is later amended without mentioning the intervening statute).

## B.

To support its implied-repeal claim, the majority traces the legislative proceedings that led to the creation of the Commission, beginning in 1967 and continuing through to the voters' adoption of Article 6, Section 21 in 1976. Majority opinion *ante* at 6-9. The historical recitation is accurate, as far as it goes. It fails to acknowledge, though, that Nevada modeled its judicial discipline commission system on California's, *see Nevada's Court Structure*, Bulletin No. 74, at 33, *available at* https://www.leg.state.nv.us/Division/Research/Publications/InterimReports/1969/Bulletin074.pdf, and that California retained its public-officer recall provision, subjecting judges to voter recall, even after it amended its constitution to create the California Commission on Judicial Performance. *See, e.g.*, Cal. Const. art. 6, §§ 8 & 18 (providing for discipline and removal of judges for misconduct by the California Commission on Judicial Performance"); Cal. Const. art. 23 (1911, amended and recodified as Cal. Const. art. II, §§ 13-14 (1976)) (providing for the public recall of public officers, including judges). Similarly, both Arizona and Oregon, which have public-officer recall provisions like Nevada's and later created judicial discipline commissions, retained their recall provisions. *E.g.*, *Jett v. City of Tucson*, 992 P.2d 426, 429 (Ariz. 1994) (acknowledging that the creation for the judicial discipline commission did not divest the electorate of their right to recall an elected judge); *see* Or. Const. art. II, § 18; *id.* art. VII, § 8. Thus, experience elsewhere, including in California from whose constitution we drew Article 6, Section 21, does not support that the creation of a judicial discipline commission displaces

or supersedes popular recall of elected judges. In fact, it supports the opposite.

Remember, "the goal of constitutional interpretation is to determine the public understanding of a legal text leading up to and in the period after its enactment or ratification." *Strickland*, 126 Nev. at 234, 235 P.3d at 608-09. With no source cited, the majority offers that "the electorate who approved [Article 6, Section 21, creating the Commission] intended that recall no longer be an available means of removing a judge from office." Majority opinion *ante* at 18. But if that was the trade—the public gave up its right to recall judges in exchange for the establishment of the Nevada Judicial Discipline Commission—you would expect the ballot materials to have told the voters what they were giving up. *See Strickland*, 126 Nev. at 239, 235 P.3d at 611 (consulting ballot materials in interpreting constitutional text). They did not. All the ballot materials said was that a "majority vote of 'yes' would amend article 6 by adding a new section to the article [that] would provide for the establishment of a Commission on Judicial Discipline which would be empowered to censure, retire, or remove justices or judges" and that "[j]ustices and judges could not be removed except for willful misconduct, willful or persistent failure to perform the duties of their offices or habitual intemperance." State of Nev. Dep't of State, Constitutional Amendments to be Voted Upon in State of Nevada at General Election, 57th and 58th Sess., at 15-17 (available at Nevada Legislative Counsel Bureau Research Library).

Citizens voted to establish the Commission because they "fel[t] that public officials, including judges, were not being held accountable for many of their actions." Nev. LCB, *Judicial Discipline* 1 (Nev. Div. Res. Publ'ns, Background Paper No.

SUPREME COURT
OF
NEVADA

(O) 1947A

14

81-8, 1981) https://www.leg.state.nv.us/Division/Research/Publications/ Bkground/BP81-08.pdf. The Commission was created to address the "shortcomings of impeachment, recall and legislative address." *Id.* at 3. Acknowledging shortcomings in the preexisting constitutional methods of removing judges is one thing; deleting them from the Constitution is another matter altogether. Article 6, Section 21 was enacted to provide *an additional, more effective option* for removing judicial officers. The electorate's ability to recall public officers—including judicial officers— through the preexisting political processes, however, remained intact.

This position—that recall and discipline are independent, alternative means of removing a judge from office—has been accepted by every court and commentator to have addressed the subject until today. This includes two of the four members of the majority, who joined the court's opinion in *Halverson v. Hardcastle*, 123 Nev. 245, 266, 163 P.3d 428, 443 (2007), which states: "Under the Nevada Constitution, a judge can be removed from office only *by the voters* [footnoting Nev. Const. art. 2, § 9], by the Legislature [footnoting Nev. Const. art. 7, §§ 2 and 3], or, as of 1976, by the Nevada Commission on Judicial Discipline [footnoting Nev. Const. art. 6, § 21(1)." (emphasis added) (dictum). It also includes the Nevada Attorney General, who opined in 1987, after Article 6, Section 21 was adopted, that judges are subject to recall under Article 2, Section 9, *see* 87-7 Op. Nev. Att'y Gen. 22, 26 (1987); Nevada constitutional scholars, Bushnell & Driggs, *supra* at 123, who wrote in 1980, just four years after voters approved Article 6, Section 21, that "[t]here are four methods by which a Nevada Supreme Court justice or district judge may be removed from office during a term: recall, impeachment, legislative [address], and removal by the Commission on Judicial Discipline. . . . *All elected judges in*

*Nevada are subject to removal during their terms through the [constitutional] recall process*" (emphasis added to that in original); and those who attempted to recall justices of this court in 2003, *see* Jeffrey W. Stempel, *The Most Rational Branch: Guinn v. Legislature and the Judiciary's Role as Helpful Arbiter of Conflict*, 4 Nev. L.J. 518, 518-19 & n.3 (2004).

### D.

The policy arguments the majority offers against subjecting judges to recall echo those made in 1972, 1988, and again in 2010, when Nevada voters were asked to amend the Constitution to provide for the appointment instead of the election of judges. *See* 2010 Ballot Question No. 1: Senate Joint Resolution 2 (74th Session), https://www.leg.state.nv.us/Division/Research/VoteNV/BallotQuestions/2010.pdf; 1988 Ballot Question No. 4: Senate Joint Resolution 17 (63d Session), https://www.leg.state.nv.us/Division/Research/VoteNV/BallotQuestions/1988.pdf; 1972 Ballot Question No. 4: Senate Joint Resolution 23 (55th Session), https://www.leg.state.nv.us/Division/Research/VoteNV/BallotQuestions/1972.pdf. Each of these measures failed, by wide margins. *Id.* This signifies that Nevada citizens prize their electoral control over our state court judges above the vision of good government the majority espouses. *See Batchelor*, 81 Nev. at 633, 408 P.2d at 241 (describing the right of recall in Article 2, Section 9 as "the people's prerogative" and stating, "Our governmental scheme dignifies the people; a treasured heritage, indeed," of which the "provision for recall is but one example."). It also signifies that, had our citizens been told in 1976 that a vote to amend the Constitution to create the Judicial Discipline Commission meant a vote to repeal the preexisting constitutional right to recall elected judges, they would not have approved

SUPREME COURT
OF
NEVADA

(O) 1947A

16

the adoption of Article 6, Section 21, creating the Commission. Given this history, I cannot subscribe to the majority's implied repeal analysis, which legitimizes a bait-and-switch on the voters who approved passage of Article 6, Section 21 in good faith, not knowing they would later be held to have abandoned their preexisting right of recall.

### III.

In the end, none of this matters very much to the parties. The City of North Las Vegas eliminated Ramsey's seat, so her term expires on June 30, 2017, N.L.V. Mun. Code §§ 2.06.010 and 2.06.020, and she has agreed to suspension without pay for the final three months of her term. *See Stipulation and Order of Consent to Discipline* (August 23, 2016), *In re Judicial Discipline of Ramsey*, Docket No. 71096. It appears to me that Ramsey's statutory rights were violated when the signature verification process for her recall proceeded without sufficient notice to her of its time and place. *Compare* NRS 293.1277(8) (giving a public officer who is the subject of a recall petition the right to witness the verification of that petition but not requiring advance notice of time and place), *with Sheriff, Humboldt Cty. v. Marcum*, 105 Nev. 824, 783 P.2d 1389 (1989) (construing a statute similarly affording a right to attend without specifying notice of time and place to require reasonable notice). If so, this matter is probably moot, as sufficient time does not remain to reverse and remand, conduct a proper signature verification, and convene and conduct a recall election.

The case has enduring significance, though, to our constitutional form of government. No matter how strong the policy argument for exempting judges from citizen recall, unless and until the voters amend the Constitution, the text of Article 2, Section 9 remains as written when it was adopted in 1912. By its terms, Article 2, Section 9,

Supreme Court
OF
Nevada

(O) 1947A

17

subjects judges, as public officers, to citizen recall. Public policy considerations do not and should not override clear constitutional text.

While I concur in the reversal to the extent a do-over of the signature verification process is needed, I therefore dissent in all other respects.

_____, J.
Pickering

I concur:

_____, J.
Douglas

SUPREME COURT
OF
NEVADA

(O) 1947A